# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00117-SCT

*UNITED STATES FIDELITY & GUARANTY COMPANY*

*v.*

*THE CONSERVATORSHIP OF IRIS ALTHEA MELSON, RANCE O'QUINN, MASSACHUSETTS CONSERVATOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/29/1999 |
| TRIAL JUDGE: | HON. MICHAEL L. CARR, JR. |
| COURT FROM WHICH APPEALED: | WILKINSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MARK D. HERBERT |
| | MICHAEL D. HERRIN |
| ATTORNEYS FOR APPELLEE: | ERIK M. LOWREY |
| | DENNIS L. HORN |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 03/07/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/28/2002 |

**BEFORE PITTMAN, C.J., EASLEY AND GRAVES, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. Rance O'Quinn (O'Quinn), as Massachusetts conservator of Iris Althea Melson (Melson), filed suit for moneys spent and invested without court approval on May 30, 1995, in the Chancery Court of Wilkinson County, Mississippi. Previously, on August 4, 1994, O'Quinn had filed to have the Mississippi temporary conservator, Thomas T. Tolliver, Jr. (Tolliver), discharged and the 1992 first and final accounting set aside. Tolliver had been appointed to serve as the conservator in Wilkinson County, Mississippi, on December 2, 1988. The chancellor had specifically stated in the order of December 5, 1988, appointing Tolliver, that he would served as temporary conservator for Melson under his current public official's bond. The chancellor determined that it was "urgent and necessitous" that the original conservator be removed and a temporary conservator appointed. Melson's original conservator was her husband Clarence Edward Melson (Clarence), who was appointed March 20, 1986. On February 9, 1988, Melson filed for divorce from Clarence thereby necessitating a new conservator.

¶2. A special chancellor was appointed to hear the matter. On September 28, 1994, Tolliver's 1992

accounting was set aside by the special chancellor, however, Tolliver remained conservator pending further proceedings. O'Quinn's suit filed on May 30, 1995, originally alleging that Tolliver, Chancery Clerk of Wilkinson County, as temporary conservator, spent and invested money belonging to Melson's conservatorship without prior court approval. On June 16, 1997, O'Quinn amended the original suit to name United States Fidelity & Guaranty Company (USF&G) as an additional defendant. USF&G had issued the public official's bond to Tolliver as chancery clerk. O'Quinn also added Sam Gwin (Gwin) and David S. Crawford (Crawford), original attorneys for the ward, as additional defendants. Gwin and Crawford settled and were released from the suit for a total settlement of $20,000, paying $10,000 each.

¶3. The special chancellor held that Tolliver "had a clear and unequivocal duty to obtain court orders prior to spending the ward's money. He did not do so...Now, my judgment is for the $128,666 [sic] spent without court authority, less the $20,000 previously collected from the attorneys as agreed to by the parties. It's the courts' opinion that the statute of limitations is no bar to actions within the period of the effectiveness of the bonds. The court awards no interest except on the judgment entered herein, and there are no attorney's fees awarded any of the attorneys by this court."

¶4. The special chancellor's final judgment was entered on January 18, 2000. The judgment was entered against USF&G and Tolliver, jointly and severally, in the amount of $108,666.03, plus interest at the rate of 8% per annum from December 29, 1999. No pre-judgment interest or attorney fees were awarded. The appeal by USF&G was filed on January 21, 2000, and on January 31, 2000, O'Quinn filed a cross appeal seeking attorney's fees and prejudgment interest. Both appeals were timely filed with this Court. Tolliver did not appeal.

## FACTS

¶5. On November 7, 1985, Melson was severely injured in an automobile accident. As a result of the accident, Melson received a structured settlement which paid her $633,099.67 in a lump sum payment and $1,800 a month until the longer of her death or twenty five (25) years. Melson's husband, Clarence, was appointed conservator on March 20, 1986, by the Chancery Court of Wilkinson County, Mississippi. Melson's conservatorship was based on her physical and mental incapacity due to her coma subsequent to the automobile accident.

¶6. By 1986, Melson had regained consciousness and moved to Massachusetts. In 1988, she instituted divorce proceedings against her husband, Clarence, in Wilkinson County, Mississippi. Due to the conflict created by the ongoing divorce proceedings, it was inappropriate for Clarence to continue to serve as Melson's conservator. In response, the Chancery Court of Wilkinson County issued an order appointing Tolliver as temporary conservator for Melson. Tolliver was never required by the court to post a separate conservator's bond. The court order stated that Tolliver would serve under his public official's bond to secure his service as Melson's conservator. Tolliver never applied for or received a separate conservator's bond from USF&G nor did he ever authorize his official bond to be put up for his service as conservator.

¶7. On February 9, 1988, as part of the divorce proceedings, the chancellor conducted an evidentiary hearing to determine Melson's mental capacity. After receiving medical testimony, the chancellor found Melson to be mentally competent in the divorce decree of February 17, 1989. However, Melson's conservatorship continued based solely on her physical incapacity.

¶8. On January 22, 1991, Melson made a formal written request to Tolliver that he release to her attorney

any legal documents he had in his possession. Tolliver did not respond to the request. On July 16, 1991, Melson's uncle, O'Quinn, petitioned a Massachusetts court to be appointed a temporary conservator of Melson in Massachusetts based on her physical incapacity. A decree granting this petition was signed on the same date in Massachusetts. O'Quinn accompanied his petition for appointment with a doctor's certificate that Melson was sufficiently mentally competent to join in the petition. Subsequently, on October 8, 1991, O'Quinn petitioned to be and was appointed permanent conservator of Melson in Massachusetts based solely upon her physical incapacity. Melson joined in O'Quinn's latter petition to be appointed permanent conservator in Massachusetts.

¶9. On August 10, 1991, O'Quinn's attorney wrote Tolliver demanding an accounting. On February 25, 1992, O'Quinn's attorney having received no response from Tolliver, again wrote Tolliver demanding an accounting. On July, 1, 1992, O'Quinn's attorney made yet another demand for an accounting from Tolliver.

¶10. On June 5, 1992, Tolliver filed his first and final accounting as temporary conservator for the period covering December 2, 1988, to June 5, 1992. Tolliver took no further action as conservator after June 5, 1992. On August 10, 1992, the chancellor approved Tolliver's first and final accounting and discharged Tolliver as conservator.

¶11. On August 4, 1994, O'Quinn filed a motion to set aside the final accounting and the order discharging Tolliver as conservator. O'Quinn's motion was granted on September 28, 1994. On December 30, 1994, Tolliver filed a substitute final accounting. On February 3, 1995, O'Quinn filed an objection to the substituted final accounting. O'Quinn's objections were based upon Tolliver's failure to obtain court approval for expenditures and investments of Melson's money.

¶12. On May 30, 1995, O'Quinn, as Massachusetts conservator, instituted suit against Tolliver in Wilkinson County, Mississippi. In his complaint, O'Quinn sought recovery of all funds spent by Tolliver without court approval. A special chancellor was appointed. On June 16, 1997, O'Quinn amended his suit to add USF&G as an additional defendant based upon USF&G issuance of a public official's bond to Tolliver in his capacity as the Chancery Clerk of Wilkinson County.

¶13. During the hearing, the parties stipulated that of the $108,666.03 in total challenged transactions, $62,961.71 of identified payments were made directly to Melson at her request between November 28, 1989, and September 30, 1991. Tolliver testified without dispute as to another $36,686.26 in payments that were made to third parties for the benefit of Melson. Included in the $36,686.26 expended, $22,000 was paid to Melson's former husband, Clarence, and his attorney pursuant to the chancellor's decree granting Melson a divorce. The following issues are raised on appeal by USF&G:

**I. Whether O'Quinn's claim is barred by the statute of limitations.**

**II. Whether Tolliver's public official's bond with USF&G should provide coverage as surety on Melson's conservatorship.**

**III. Whether it produced inequitable results by requiring USF&G to repay all disbursements made by Tolliver.**

On cross-appeal, O'Quinn raises the following issues:

**I. Whether the special chancellor erred in denying the award of prejudgment interest.**

**II. Whether the special chancellor erred in denying the award of attorneys' fees.**

**DISCUSSION**

¶14. This Court uses a de novo standard of review when passing on questions of law. *Miss. Farm Bureau Cas. Ins. Co. v. Curtis*, 678 So. 2d 983, 987 (Miss. 1996); *Estate of Bodman v. Bodman*, 674 So.2d 1245, 1248 (Miss. 1996). In order to begin our legal discussion of this issue raised by USF&G, it is necessary to first examine the differences and similarities between guardianships and conservatorships.

¶15. This Court in *Harvey v. Meador*, 459 So.2d 288, 291-92 (Miss. 1984), distinguished guardianships from conservatorships as follows:

> Guardians may be appointed for minors, Miss. Code Ann. § 93-13-15 (1972); or incompetent adults, Miss. Code Ann. § 93-13-121 (Supp. 1983); a person of unsound mind, Miss. Code Ann. § 93-13-123, 125 (1972); alcoholics or drug addicts, Miss. Code Ann. § 93-13-131 (1972); convicts in the penitentiary, Miss. Code Ann. § 93-13-135 (1972); persons in the armed forces or merchant seamen reported as missing, Miss. Code Ann. § 93-13-161 (1972); or for veterans entitled to receive moneys from United States Veterans' Bureau, Miss. Code Ann. § 35-5-5(1972) or minor wards of a veteran, Miss. Code Ann. § 35-5-7 (1972). The guardian is the legally recognized custodian of the person or property of another with prescribed fiduciary duties and responsibilities under court authority and direction. A ward under guardianship is under a legal disability or is adjudged incompetent.
>
> In recent decades there has been an increased number of older adults in our society who possess assets in need of protective services provided through a guardianships. But modification of laws have broadened the definition of persons for whom assistance can be afforded by the courts, and such statutes do not restrict such protection only to the adult incompetent or insane.
>
> Noting that trend in our society, the Mississippi Legislature incorporated into law in 1962 the conservatorship procedure for persons who, by reason of advanced age, physical incapacity, or mental weakness, were incapable of managing their own estates. Miss. Code Ann. § 93-13-251, et seq. (1972).
>
> Thus, the Legislature provided a new procedure through conservatorships for supervision of estates of older adults with physical incapacity or mental weakness, without the stigma of legally declaring the person non compos mentis. This additional procedure was intended to encompass a broader class of people than just the incompetent. *See* Uniform Probate Code § 5-304 Comment (1975). *See also* 18 J.Fam.L. 819 (1980). *Family Law*, Vol. 18, p. 819.
>
> Therefore, the distinguishing feature of conservatorship from a guardianships lies in part in the lack of necessity of an incompetency determination of the existence of a legal disability for its initiation. **After establishment of such protective procedures, the duties, responsibilities and powers of a guardian or conservator are the same.** Miss. Code Ann. § 93-13-259 (1972). *See also* 51 Miss.L.J. 239, 266 (1980).

(emphasis added).

¶16. Miss. Code Ann. § 93-13-259 (1994) provides that the general functions of a conservator are as follows:

> Should the court appoint the conservator of the property or person or property and person of the subject party, the said conservator shall have the same duties, powers and responsibilities as a guardian of a minor, and all law relative to the guardianship of a minor shall be applicable to a conservator.

### I. Whether O'Quinn's claim is barred by the statute of limitations.

¶17. USF&G argues that O'Quinn's claim is time barred by the statute of limitations. O'Quinn was appointed temporary conservator of Melson in the State of Massachusetts on July 16, 1991, and subsequently, conservator on October 8, 1991. Since being appointed Melson's Massachusetts conservator, O'Quinn made two demands on Tolliver for an accounting, on August 10, 1991, and February 25, 1992. USF&G contends that the statute of limitations began running on O'Quinn's claim from the date of his appointment as temporary conservator. However, Tolliver only filed his first and final accounting on June 5, 1992, for the period of December 2, 1988, to June 5, 1992. O'Quinn filed suit against Tolliver on May 30, 1995. Later O'Quinn amended his suit to include USF&G as a party defendant. In addressing this issue, we must first determine the applicable statute of limitation.

### A. Applicable Statute of Limitations

¶18. The applicable statute of limitation to the case at hand is Miss. Code Ann. § 15-1-49 (1995). Miss. Code Ann. §  15-1-49 is Mississippi's general "catch all" statute of limitations. In *State v. Smith*, 156 Miss. 288, 125 So. 825 (1930), this Court held that the limitation on an action brought on an official bond is that provided for actions on written contracts. This holding was cited and followed in *Sanders v. Nunley*, 1997 WL 88200 (N.D. Miss. 1997). *See also City of Mound Bayou v. Johnson*, 562 So.2d 1212, 1217 n.3 (Miss. 1990).

¶19. Since there is no specific statute of limitations for claims on written contracts, § 15-1-49 therefore applies. Miss. Code Ann. § 15-1-49 states:

> (1) All actions for which no other period of limitation is prescribed shall be commenced within (3) years next after the cause of such action accrued, and not after.

> (2) In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.

> (3) The provisions of subsection (2) of this section shall apply to all pending and subsequently filed actions.

Thus, the claims of O'Quinn as Melson's conservator, or of Melson herself, are subject to the three year limitations pursuant to Miss. Code Ann. § 15-1-49. Therefore, the real question addressed to this Court is when the three-year statute of limitations begins to run against O'Quinn's claims.

### B. Tolling or "Saving" Provision

¶20. O'Quinn argues that Miss. Code Ann. § 15-1-59 (1995) provides that the statute of limitations does not run against a person who is under a legal disability. That, however, is not completely accurate. Miss. Code Ann. § 15-1-59 states that:

> If any person entitled to bring any of the personal actions mentioned shall, at the time at which the cause of action accrued, be under the **disability of infancy or unsoundness of mind**, he may bring the actions within the times in this chapter respectively limited, after his disability shall be removed as provided by law. However, the saving in favor or persons under disability of unsoundness of mind shall never extend longer than twenty-one (21) years.

(emphasis added).

¶21. Melson was determined to be mentally competent by the Wilkinson County Chancery Court on February 9, 1988, in her divorce proceedings. Melson's conservatorship in Mississippi continued based solely on her physical incapacity. Furthermore, on October 8, 1991, O'Quinn was appointed Melson's permanent conservator based solely on her physical disability. The Massachusetts court did not determine Melson to be of unsound mind in establishing O'Quinn as conservator. Melson had a permanent conservator in Massachusetts protecting her financial affairs. Therefore, USF&G contends that the Miss. Code Ann. § 15-1-59 is not applicable to the facts at bar. We agree.

¶22. Melson does not fall under the "saving" clause provided in Miss. Code Ann. § 15-1-59. Miss. Code Ann. § 15-1-59 allows the statute of limitations to be tolled in favor of persons under the disability of unsound mind until the disability is removed. However, the saving in favor of persons under the disability of unsound mind shall never extend longer than twenty-one years. The facts do not support that Melson was of unsound mind during the time that Tolliver served as conservator.[1] Therefore, we find that Melson does not fall within the tolling provisions of § 15-1-59. Melson's conservatorships in Mississippi and Massachusetts both exist for the sole reason of her physical incapacity.

¶23. Miss. Code Ann. § 1-3-57 (1998) defines the term "unsound mind" when used in any statute to reference idiots, lunatics, and persons non compos mentis. The test for determining whether a person is of unsound mind for purposes of tolling the statute of limitations was provided by this Court in *Shippers Exp. v. Chapman*, 364 So.2d 1097, 1107 (Miss. 1978), which held:

> The test as to whether the claimant is so 'mentally incompetent' as to toll the running of the statute of limitations, is this: Is his mind so unsound, or is he so weak in mind, or so imbecile, no matter from what cause, that he cannot manage the ordinary affairs of life?

¶24. This Court in *Rockwell v. Preferred Risk Mut. Ins. Co.*, 710 So.2d 388, 391 (Miss. 1998), further provided that:

> The purpose of the savings statute is to protect the legal rights of those who are unable to assert their own rights due to disability.

¶25. USF&G argues that Miss. Code Ann. § 15-1-59 is also not applicable to tolling Melson's claim since O'Quinn, as Melson's conservator, had full authority under Massachusetts law to bring suit for Melson to recover any assets. *See* § § 20,37 and 38 C. 201, Annotated Laws of Massachusetts. USF&G cites Miss. Code Ann. § 15-1-53 (1995) in support of its argument.

¶26. Miss. Code Ann. § 15-1-53 provides:

> When the legal title to property or a right in action is in an executor, administrator, guardian, or other trustee, the time during which any statute of limitations runs against such trustee shall be computed against the person beneficially interested in such property or right in action, although such person may be under disability and within the saving of any statute of limitations; and may be availed of in any suit or actions by such person.

¶27. Therefore, under Miss. Code Ann. § 15-1-53, if a person who is subject to infancy or unsoundness of mind does in fact have a guardian or conservator appointed for them, then the action may be brought in the name of that guardian or conservator, without the consideration of any savings clause. Where a guardian or conservator has been court appointed for a ward, there is no logical or equitable reason to prevent the running of the statute of limitations inasmuch as that guardian or conservator is fully authorized to employ attorneys and bring actions on their behalf. *McCain v. Memphis Hardwood Flooring Co.*, 725 So.2d 788 (Miss. 1998)(statute of limitations is not tolled when a person of unsound mind has a guardian).

¶28. USF&G argues that the statute of limitations began to run from the date of the last disbursement made by Tolliver which occurred on March 20, 1992. The lawsuit against Tolliver was filed on May 30, 1995, and amended to include USF&G on June 16, 1997. USF&G argues that with no savings clause to toll the running of Miss. Code Ann. § 15-1-49, Melson faces the same limitations as O'Quinn. As previously noted, all of the questioned transactions occurred between February 13, 1989, and March 20, 1992. USF&G contends that, at the very least, statute of limitations on all of these claims expired on March 20, 1995.

¶29. The problem with USF&G's argument, that being the statute of limitations runs from the date of the last disbursement, is that it conflicts with existing holdings of this Court. This Court in *Bell v. Rudolph*, 70 Miss. 234, 12 So. 153, 154 (1882), held that:

> The statute of limitations does not begin to run in favor of a surety on a guardian's bond against the ward from the time he is discharged from liability for future acts of the guardian but from the time the guardian accounted to the wards.

*See also **Nunnery v. Day***, 64 Miss. 459, 1 So. 636 (1887).

¶30. In *Patterson v. Clingan*, 93 Miss. 310, 47 So. 503, 504 (1908), this Court stated that:

> When the functions and authority of the guardian over the person and estate of the ward for the future ends, and his obligation to make [a] final account and settlement for the past begins, and he remains guardian for such purpose, and the statute of limitations does not begin to run in favor of him, or the sureties on his bond, until this is done.

¶31. The Court in *Patterson* further stated that:

> The general rule is that the office of a trustee ceases only with the execution of his trust, and the duty of a guardian, as trustee, to account and settle, continues until he has done so and is discharged by order of the proper court. *Henderson v. Winchester*, 31 Miss. 290; *Davis v. Cheves*, 32 Miss. 317; *Denson v. Denson*, 33 Miss. 560.

47 So. at 504.

¶32. Tolliver filed his first and final accounting with the lower court on June 5, 1992. Tolliver was then discharged on August 10, 1992. On September 28, 1994, the lower court granted O'Quinn's motion dated August 4, 1994, to set aside Tolliver's accounting. O'Quinn filed suit against Tolliver on May 30, 1995. The suit against Tolliver was amended on June 16, 1997, to add USF&G as a party defendant. The last disbursement made by Tolliver without court approval occurred on March 20, 1992.[2]

¶33. Since Tolliver's first and final accounting was not filed until June 5, 1992, we find that O'Quinn satisfied the statute of limitations by filing suit on May 30, 1995, within the three year statute of limitations. Therefore, this issue is without merit.

### II. Whether Tolliver's public official's bond should with USF&G provide coverage as surety on Melson's conservatorship.

¶34. The chancellor specifically ordered that Tolliver would be appointed temporary conservator for Melson and that his public official's bond would stand as surety. USF&G argues that for it to incur any liability for acts committed by Tolliver as conservator of Melson's assets, those actions must have been contemplated by the parties at the time the public official's bond was executed and included under the bond's clear and unambiguous terms. USF&G's position is that the public bond only covers Tolliver's performance or nonperformance of the duties of his office. In order for the surety to be held liable under its public official's bond, the official's act or omission must be within the scope or duties of his office. ***United States Fid. & Guar. Co. v. State ex rel. Stringfellow***, 254 Miss. 812, 182 So.2d 919, 922 (1966); *see also **McCoy v. Key***, 155 Miss. 64, 123 So 873 (1929); ***Dean v. Brannon***, 139 Miss. 312, 104 So.173 (1925).

¶35. USF&G cites Miss. Code Ann. § § 9-5-137 (Supp. 2001) and 9-5-141 (1991) as a listing of the duties of a chancery clerk. Miss. Code Ann. § 9-5-137 provides:

> It shall be the duty of the clerk to preserve and keep all records, files, papers and proceedings belonging to his office, and to record all last wills and testaments which may be probated; all letters testamentary, of administration, and guardianship; all accounts allowed; all inventories, appraisements, and reports duly returned; all instruments which are duly proved, and by which law are required to be recorded in his office, in well-bound books to be kept for that purpose, each class in a separate book or books, or by means of electronic filing or storage or both in addition to or in lieu of any such physical records as provided in Section 9-1-51 through 9-1-57, as the clerk may elect; all records shall be properly indexed. He shall issue all process which may be required of him by law or by order of the court, or the chancellor in vacation; and shall discharge all other duties which may be required of him by law, or which properly appertain to the duties of his office. The clerk shall be under the direction of the court in term time, and of the chancellor in vacation.

Furthermore, Miss. Code. Ann. § 9-5-141 provides:

> The clerk or his deputy may at any time receive and file all bills, partitions, motions, accounts, inventories, reports, or other papers offered for that purpose, and may issue all process authorized by law and proper in any matter or proceeding. He may also at any time, in term time or vacation, perform the following functions; issue warrants of appraisement to appraise the personal estate of

decedents; allow and register claims against estates being administered in the court of which he is clerk; make all orders and issue all process necessary for the collection and preservation of estates of decedents, minors, and persons of unsound mind; appoint some person to collect and preserve the estate of any decedent in the state in any case provided for; grant letters of administration to the husband or wife, or other person entitled thereto; take the proof of wills, admits wills to probate, in common form, grant letters testamentary, letters of administration with the will annexed and de bonis non; appoint guardians for minors, persons of unsound mind, and convicts of felony; grant letters of administration; institute suits in cases provided for, and, whenever an appeal shall be taken from the grant of letters testamentary, of administration, or guardianship, appoint some fit person to discharge duties pending the appeal. He may do all such other acts as are provided by law and by the Mississippi Rules of Civil Procedure.

¶36. USF&G argues that "the duties of a chancery clerk set forth above do not include serving as conservator over the assets of a physically incapacitated ward." The chancellor appointed Tolliver temporary conservator of Melson due to the fact that her original conservator had a conflict serving in that capacity. The lower court ruled that "Thomas C. Tolliver, Jr., is a fit and proper person to serve in that capacity under his current public bond." Despite the chancellor's ruling, USF&G argues that they never agreed that Tolliver's public official's bond would stand as surety. USF&G contends that Tolliver's appointment was not based on his position as a chancery clerk and that no proof was submitted to prove that no one else was qualified to serve as conservator for Melson other than Tolliver.

¶37. Miss. Code Ann. § 93-13-251 (1994) provides:

If a person by reason of advanced age, physical incapacity or mental weakness is incapable of managing his own estate, the chancery court of the county wherein such person resides may, upon the petition of such person or of one or more of his friends or relatives, appoint a conservator to have charge and management of the property of such person, and if the court deems it advisable, also to have charge and custody of the person subject to the direction of the appointing court.

¶38. Additionally, Miss. Code Ann. § 93-13-21 (1994) provides for appointment of the chancery clerk when no guardian will qualify. Miss. Code Ann. § 93-13-21 states:

If someone will not qualify as guardian of a ward who has property, it shall be the duty of the chancery court or the chancellor in vacation to appoint the clerk of said court to be the guardian of the ward, who shall discharge the duties of guardian, under the order and direction of the court, and be subject to be dealt with as for a contempt for failure. He shall be required to give a special cumulative bond as guardian, and his official bond shall also cover his liability as guardian, and he shall; but he shall not be bound to incur any cost, except out of the estate of his ward; and he shall be allowed not more than ten percent (10%) on the amount of the estate, if finally settled. At the expiration of his right to the office, he shall make a settlement of his guardianship, and immediately deliver the property of the ward to his successor in office or to such other person as the court or chancellor may have directed.

¶39. This Court in *Faust v. Murphy*, 71 Miss. 120, 13 So. 862 (1893), stated:

Where the chancery clerk has been appointed guardian, if no specified bond be required of him, the code provisions control, and his official bond will stand as security for the ward.

¶40. We find that the trial court did not err in appointing Tolliver to serve as conservator subject to his public official's bond. Therefore, this issue is without merit.

### III. Whether it produced inequitable results by requiring USF&G to repay all disbursements made by Tolliver.

¶41. During Tolliver's service as conservator, he never obtained prior court approval for disbursements made from Melson's conservatorship. This fact is undisputed by the parties.

¶42. Miss. Code Ann. § 93-13-38(2) (Supp. 2001) states:

> It shall be duty of the guardian of wards as defined by Section 1-3-58, Mississippi Code of 1972, to improve the estate committed to his charge, and to apply so much of the income, profit or body thereof as may be necessary for the comfortable maintenance and support of the ward and of his family, if he have any, after obtaining an order of the court fixing the amount. And such guardian may be authorized by the court or chancellor to purchase on behalf of an in the name of the ward with any funds of such ward's estate sufficient and appropriate property for a home for such ward or his family on five (5) days' notice to a member of said family, or the necessary funds may be borrowed and the property purchased given as security. The guardian is empowered to collect and sue for and recover all debts due his said ward, and shall make payment of his debts out of the personal estate as executors and administrators discharge debts out of the estate of decedents, but the exempt property of the ward shall not be liable for debts, and no debts against such estate shall be payable by such guardian unless first probated and registered, as required of claims against the estate of decedent.

¶43. The special chancellor, in the bench opinion, stated that Miss. Code Ann. § 93-13-39 absolutely required prior approval of expenditures and without such prior approval, the conservator would be liable. The special chancellor relied on ***Conservatorship of Mathews***, 633 So.2d 1038, 1039-40 (Miss. 1994). In ***Mathews***, Dan Mathews (Dan) was appointed conservator for his aunt, Frances Mathews (Frances). Dan's first three accountings were approved by the chancellor. However, Dan was later removed as conservator upon the petition of another one of Frances's nephews. During the conservatorship, Dan made expenditures from the conservatorship without first obtaining court approval, among other issues.

¶44. This Court in ***Matthews***, in criticizing the actions of the conservator stated:

> It shall be the duty of the guardian...to improve the estate committed to his charge, and to apply so much of the income, profit or body thereof as may be necessary for the comfortable maintenance and support of the ward and of his family, if he have any, *after obtaining an order of the court fixing the amount*... The guardian is empowered to collect and sue for and recover all debts due his said ward...(Emphasis added).

> This statute requires that a court order fixing the amount to be spent for the care and maintenance of the ward be obtained *prior* to making such expenditures. Dan simply made the expenditures as he saw fit. When this Court addressed such action in ***Welch v. Childers***, 195 Miss. 415, 420, 15 So.2d 690, 691 (1943), we held:

> A minor under guardianship is a ward of the [c]hancery [c]ourt. All receipts and disbursements of his estate are required to be under the authority and direction of the [c]hancery [c]ourt or the [c]hancellor

in vacation. The expenses for the maintenance and support of the ward cannot be proved in any other way. The object of the law is to guard against dishonesty and mismanagement of the estate by the guardian...

The law does not leave the amount of the expenditures by the guardian for the maintenance, support and education to (the guardian's) discretion. The sum must be fixed by the court. If the guardian contracts therefor without the sanction of the chancery court or chancellor, the liability therefor is personal to him, and he cannot be allowed for it in this accounts for the ward. The guardian has no power to bind the estate of his ward without the sanction of the chancery court or the chancellor.

*Mathews*, 633 So.2d at 1039-40.

¶45. However, this Court in *Mathews*, further held that the chancellor has authority to consider the expenditures made without court approval. *Id*. at 1041. The Court found that the sole question for consideration in *Matthews* was whether the chancellor abused his discretion in removing Dan as conservator. The Court did not address the justification for any expenditures made by Dan as conservator, or their reasonableness or necessity. *Id*. The Court stated that these may be proper inquiries on remand. *Id*. (*citing Neville v. Kelso*, 247 So.2d 828, 834-35 (Miss. 1971)).

¶46. In *Neville*, this Court stated that:

A guardian of a non compos mentis has a reasonable area of discretion in determining what part of the income of his ward should be spent for support, maintenance and education. Previously unauthorized but reasonable and proper expenditures from income for the n. c. m. ward may be ratified and approved by the court after they are made, either by special order or on the annual or final account. The chancery court has the power to ratify and approve such expenditures. However, the only way the guardian can protect himself absolutely (except for fraud) from a later contest of reasonableness and propriety of the expenditure from income is by obtaining a prior order. Where he fails to do so the guardian must risk disallowance by the court of the income expenditure, if it was not a reasonable and proper expense in supporting, maintaining or educating the ward.

Accordingly, the chancery court erred in concluding that an expenditure by the guardian from income, without previous express authority, is invalid and cannot be ratified and approved by the court.

The rule which we have adopted is in accord also with the general rule in other jurisdictions. 39 Am.Jur.2d, Guardian and Ward § 70 (1968) states:

A guardian may use the interest and profits of his ward's estate for the support and education of his ward and may obtain credit therefor upon the rendition of his account, even though, as a general rule, such expenses were incurred without previous authorization by the court.

¶47. The same text in section 72 states:

As a general rule, however, even though prior authorization therefor was not obtained, a guardian will be allowed credit in his accounting for judicious expenditures made in good faith from the income of the ward's estate, and the courts of some of the jurisdictions adhere to the view that in a proper case a guardian may, without prior order of court, expend the principal of a ward's estate for his maintenance or education.

See also Annot., 130 A.L.R. 113, 117 (1941).

¶48. In 39 C.J.S. *Guardian and Ward* § 88, at 155-56 (1944), it is stated:

[O]rdinarily where a court order is obtained authorizing particular expenditures the guardian is protected, and the expenditures cannot be questioned, except for fraud, in the settlement of the guardian's final account. As a general rule a prior authorization by the court is not necessary, since the court may, by allowing the credit or otherwise, approve or ratify a previously unauthorized expenditure. Obviously, however, a guardian who proceeds with the management of the estate and makes expenditures without a previous court order faces the hazard that the court afterward may not ratify or approve such acts.

*Neville*, 247 So.2d at 834-35.

¶49. In *Neville*, the Court only allowed distribution of income of the conservatorship to be made without the necessity of prior court approval. *Id*. at 834. The Court in *Neville*, quoting *Deposit Guar. Bank & Trust Co. v. Mangum*, 172 Miss. 443, 16 So. 386, 387 (1935), addressed the expenditure of capital without a court order by stating:

In order to expend more than the income of the estate it is necessary for the guardian to secure an order of the court prior to such expenditure. *Chapman v. Pentecost*, 161 Miss. 600, 137 So. 539, in which it was held that a precedent order of the court or chancellor is indispensable in determining whether the guardian shall bear the expenses of a ward whose parents are living. It is true this decision was rendered in a case where a minor was involved, but the same rule is applied as to others. The statute plainly requires a previous order of court.

¶50. Furthermore, Miss. Code Ann. § 93-13-261 (1994) limits the ward's powers as follows:

So long as there is a duly appointed conservator, the person whose property or person is in the charge of such conservator shall be limited in his or her contractual powers and contractual obligations and conveyance powers to the same extent as a minor.

¶51. Incompetence is not a sole issue in determining whether a conservator has the power to act on behalf of a ward since a conservator has the power to act for a ward who is also mentally competent. *See Will of Mingo v. Mingo*, 743 So.2d 433, 434 (Miss. Ct. App. 1999). A conservatorship limits the contractual and conveyance powers of its ward. *See Lee v. Lee*, 337 So.2d 713, 714 (Miss. 1976); Miss. Code Ann. § 93-13-261.

¶52. It is undisputed that no court order was obtained for disbursements made by Tolliver from Melson's conservatorship. The case law and statutory language clearly require that prior court approval be obtained before expenditure of capital. This was not done in the case at hand. USF&G notes that the special chancellor did not make a distinction as to whether all the expenditures were capital or some from the conservatorship income.

¶53. The facts are further undisputed that since at least February 17, 1989, Melson was mentally competent. Melson also had a Massachusetts conservator in addition to Tolliver in Mississippi. The record reflects that Melson participated significantly in the management of her assets and often communicated

directly with Tolliver as to transactions in her account. She also came back to Mississippi on a regular basis, during which she would confer with Tolliver concerning her business affairs. Tolliver testified that of the $108,666.03 in challenged transactions, $62,961.71 were payments made directly to Melson at her express direction. There was no testimony that these funds were wasted in any way or that they, in fact, do not this day still remain on deposit in Melson's Massachusetts bank account.

¶54. Another $36,686.26 of the funds were spent on Melson's behalf, most paid to third parties at her express direction, $22,000 pursuant to the divorce decree, $15,000 to her former husband and $7,000 to her husband's divorce attorney.

¶55. Besides meeting with Melson, Tolliver testified as to meetings he had with O'Quinn including one in which O'Quinn advised Tolliver to pay the income taxes from the conservatorship. The taxes were also paid to the Internal Revenue Service without obtaining prior approval.[3]

¶56. Clearly, Tolliver should have requested prior court approval before making any expenditures from the conservatorship. To allow the payments to be made without court approval to parties other than Melson could create a dangerous precedent that would undermine the protections afforded a ward. However, forcing USF&G to repay all of the expenditures would create a windfall to Melson and produce inequitable results. Nothing in the record supports a finding that the payment of the $62,961.71 to Melson and the $22,000 pursuant to the divorce decree was driven by dishonesty on the part of Tolliver or that it resulted in mismanagement of the estate.

¶57. While mentally competent, Melson remained under a conservatorship. Melson also had a conservator appointed in Massachusetts. However, no evidence was presented that the $62,961.71 received by Melson was misused or wasted in any way by Tolliver. To allow the $62,961.71 in repayment to Melson would create an inequitable outcome. It is undisputed by the parties that $62,961.71 of the $108,666.03 in expenditures went directly to Melson at her request.

¶58. In ***Quitman County v. Turner***, 196 Miss. 746, 18 So.2d 122, 124 (1944) this Court held that:

> Legislative intent as an aid to statutory construction, although often elusive to the perception of unaided vision, remains nevertheless the pole star of guidance... It is our duty to support a construction which would purge the legislative purpose of any **invalidity, absurdity or unjust inequality**. ***Robertson v. Texas Oil Co.***, 141 Miss. 356, 106 So. 449.

(emphasis added). *See also* ***City of Jackson v. Lakeland Lounge of Jackson, Inc.***, 688 So.2d 742, 747 (Miss. 1996); ***Thornhill v. Ford***, 213 Miss. 49, 56 So.2d 23 (1952). Therefore, we decline to require the repayment of the $62,961.71 that was paid directly to Melson.

¶59. Furthermore, disbursements were also made from the conservatorship to Melson's former husband, Clarence, for $15,000 and to Clarence's divorce attorney for $7,000. Melson was obligated to pay the $22,000 by court order to Clarence and his attorney. While Tolliver did not petition the chancery court as conservator for approval of these payments in advance, both payments were made pursuant to Melson's divorce decree. Had Tolliver, as conservator, in fact petitioned for approval to make these two payments, he would have submitted his petition to the same chancellor who had granted the divorce decree and who had ordered Melson to make the payments to her former husband. No one disputes the money was paid as ordered in the divorce decree.

¶60. Clearly, as argued by USF&G, requiring repayment of the money specifically approved by the chancery court in the divorce is putting form over substance. The chancellor was clearly aware of the conservatorship and the extent of Melson's assets during the divorce proceedings. This transaction aptly illustrates the inequity created as to USF&G by the special chancellor's decision.

¶61. Without extending this case beyond the facts at hand, in order to avoid creating an absurd and inequitable result in this specific case, we find that the special chancellor's award to Melson for $108,666.03 should be reduced by the $62,961.71 paid directly to Melson, and the $22,000 paid to Melson's former husband and his divorce attorneys pursuant to the divorce decree. This reduction is solely for the purpose of preventing an unfair result and in no way is intended to weaken the protections afforded a ward under a conservatorship or beyond the specific situation at bar.

## Cross-Appeal:

### I. Whether the special chancellor erred in denying to award prejudgment interest.

¶62. On cross-appeal, O'Quinn further seeks to recover prejudgment interest from USF&G and Tolliver which was denied by the special chancellor. The special chancellor did not award the prejudgment interest and attorney's fees to O'Quinn. In the bench opinion, the trial court stated that "the court awards no interest except on the judgment entered herein, and there are not attorney's fees awarded any of the attorneys by this court." The special chancellor further stated in the court's written opinion that, "the court further finds that it does not allow any prejudgment interest, nor does this court award any attorney's fees to any of the attorneys in this matter."

¶63. O'Quinn argues that the appropriate interest rate is 8%, and that this interest should be added to the $108,166.03 which was disbursed from the conservatorship from the date of filing the motion to set aside Tolliver's accounting, August 4, 1994, through the date of the judgment, January 18, 2000. O'Quinn submits that applying 8% simple interest without compounding amounts to $43,266.41.

¶64. O'Quinn's claim for prejudgment interest is based on Miss. Code Ann. § 93-13-57 (1994), which provides that:

> Any guardian who fails to report to the court the fact that he has money of the ward not needed or allowed to be used for current expenditure and to ask the order of the court as to the disposition of such money, **may** be chargeable with interest on the same at the rate of 8% per annum during the time of failure."

(emphasis added).

¶65. O'Quinn argues that in the interest of justice and equity the word "may" in § 93-13-57 should become the word "shall," citing **Welch v. Childers**, 195 Miss. 415, 15 So.2d 690, 691 (1943) as authority. In **Welch**, this Court allowed the award of both prejudgment interest and post-judgment interest. However, the Court in **Welch** did not state that the award of prejudgment interest was mandatory.

¶66. O'Quinn further relies upon Miss. Code Ann. § 75-17-7 (2000) which provides that prejudgment interest may be awarded in an amount to be set by the court for all liquidated amounts. Whether to award prejudgment interest under both Miss. Code Ann. §§ 93-13-57 and 75-17-7 remains absolutely within the discretion of the chancellor. This Court in **Fred's Stores of Miss., Inc. v. M&H Drugs, Inc.**, 725 So.2d

902, 921 (1998) held that, "an award of prejudgment interest is normally left in the discretion of the trial judge." (citing *Warwick v. Matheney*, 603 So.2d 330, 342 (Miss. 1992)).

¶67. It is the well-settled law in this State regardless of the statute under which prejudgment interest is sought, the award of such interest is entirely within the discretion of the trial court. "An award of prejudgment interest rests in the discretion of the awarding judge." *Murphree v. Aberdeen-Monroe County Hosp.*, 671 So.2d 1300, 1304 (Miss. 1996). *See also Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.*, 743 So.2d 954, 971 (Miss. 1999); *Preferred Risk Mut. Ins. Co. v. Johnson*, 730 So.2d 574, 577 (Miss. 1998). Therefore, we find that no proof was submitted to support that the special chancellor erred in denying to award prejudgment interest. This issue is without merit.

## II. Whether the special chancellor erred in denying the award of attorneys' fees.

¶68. O'Quinn argues on cross-appeal that the special chancellor erred in denying to award any attorneys' fees. O'Quinn states that the attorneys' fees are shown to be $42,473.64.[4] O'Quinn alleges that "when Mr. Tolliver ceased to act as a conservator and assumed the role of the chancellor and court, he became liable in both his personal and professional capacity not only for the unauthorized amount withdrawn, but also for the cost of attorney's fees in rectifying the situation. To award anything less results in an unjust enrichment to Mr. Tolliver at the expense of the ward."

¶69. The special chancellor's decision denied the award of all attorneys' fees. Whether to award attorney's fees rests entirely within the discretion of the trial court. "A trial court's decision on attorney's fees is subject to the abuse of discretion reviewed (citations omitted)...It is well-settled that attorney's fees are not to be awarded unless the state or other authority so provides." *Sentinel*, 743 So.2d at 971. "Unless the chancellor is manifestly wrong, his decision regarding attorney's fees will not be disturbed on appeal. Absent an abuse of discretion, the chancellor's decision in such matters will generally be upheld." *Zeman v. Stanford*, 789 So.2d 798, 806 (Miss. 2001) (citations omitted).

¶70. We find that O'Quinn has failed to meet the abuse of discretion standard regarding the trial court's specific decision to not award attorney's fees. Therefore, this issue is without merit.

## CONCLUSION

¶71. The special chancellor's award of $108,666.03 plus post-judgment interest is reduced by the $62,961.71 paid directly to Melson and the $22,000 paid pursuant to the divorce decree on Melson's behalf. This holding is limited to the specific facts of the case at bar. The special chancellor's denial of prejudgment interest and attorney's fees is hereby affirmed.

¶72. **AFFIRMED IN PART AND REVERSED AND RENDERED IN PART.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, DIAZ, CARLSON AND GRAVES, JJ. CONCUR. COBB, J., CONCURS IN RESULT ONLY.**

1. After her accident, Melson was initially in a coma. The facts are clear that Melson remains a ward of the conservatorship solely on the basis of her physical incapacities rather than being of unsound mind.

2. Ex. P-15 lists as a challenged transaction on April 16, 1992, disbursement to the Internal Revenue Service. However, at trial, O'Quinn stipulated that he was not seeking relief as to this transaction.

3. O'Quinn did not pursue the money paid to the Internal Revenue Service.

4. Two attorneys represented O'Quinn, Dennis Horn and Erik Lowrey. O'Quinn argues that the only objection to the attorney's fees was whether there was a duplication of services provided. However, USF&G counters that the attorneys' fees amount was never introduced into evidence but only offered for identification purposes.