# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-01738-SCT

*IN RE THE GUARDIANSHIP OF ALBERT JERMAINE DUCKETT AND WALTER WILLIAMS, JR.; WALTER WILLIAMS, SR., GUARDIAN: BANCORPSOUTH BANK f/k/a BANK OF MISSISSIPPI*

*v.*

*ALBERT JERMAINE DUCKETT, WALTER WILLIAMS, JR., AND WALTER WILLIAMS, SR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/17/2006 |
| TRIAL JUDGE: | HON. TALMADGE D. LITTLEJOHN |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JAMES PATRICK CALDWELL LES ALVIS |
| ATTORNEYS FOR APPELLEES: | JOHN R. WHITE GREGORY D. KEENUM |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART - 06/12/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DIAZ, P.J., DICKINSON AND RANDOLPH, JJ.**

**DIAZ, PRESIDING JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1.    The Chancery Court of Tishomingo County granted summary judgment in favor of Albert Jermaine Duckett (Albert) and Walter Williams, Jr. (Junior) on their claims against BancorpSouth for allowing their father and former guardian, Walter Williams, Sr. (Walter),

to convert the guardianship funds that had been deposited in a BancorpSouth savings account. After conducting a hearing to determine the damages owed by BancorpSouth, the chancery court awarded Albert and Junior $1,770,480.40 in actual damages, punitive damages, attorney's fees and prejudgment interest.  Aggrieved, BancorpSouth now appeals and raises the following issues for review: (1) whether the court erred in granting Albert summary judgment because his claim is barred by the three-year statute of limitations; (2) whether the court erred in not reducing the actual damages awarded against BancorpSouth by the amount of the unauthorized expenditures made by Walter for the benefit of the wards; (3) whether the court erred in awarding punitive damages against BancorpSouth; (4) whether the court erred in awarding attorney's fees to the plaintiffs; (5) whether the court erred in its calculation of prejudgment interest; and (6) whether the court erred in allowing Walter to testify during the hearing on damages.

### FACTS AND PROCEEDINGS BELOW

¶2.	On April 3, 1993, Sharron Williams was shot and killed by an inmate of the Tishomingo County Jail who was picking up meals at the hospital facilities of her employer, Tishomingo Health Services, Inc.  She left behind two minor children, Albert and Junior. Walter, the former husband of Sharron Williams and the father of both children, was appointed by the Chancery Court of Tishomingo County as their guardian on June 7, 1993. He posted a $50,000 guardianship bond with the United States Fidelity & Guaranty Company (USF&G, now Saint Paul Insurance Company).

¶3.	Walter filed on behalf of his two minor sons a workers' compensation suit against Tishomingo Health Services and two wrongful death actions against the Sheriff of

2

Tishomingo County and the members of the Tishomingo County Board of Supervisors, among others. On March 10, 1995, the Tishomingo County Chancery Court entered an order authorizing Walter to settle the workers' compensation claim for $5,000. On the same day, the court also issued a decree authorizing Walter to settle the wrongful death claim for an undisclosed amount. The decree approving the settlement of the wrongful death claim provided in pertinent part:

> This Court finds and Orders that, with the exception of sums to be paid as attorneys fees and/or as reimbursement for necessary costs and expenses of litigation which may forthwith be withheld and distributed to the appropriate counsel described herein, the remainder of the settlement funds shall be placed in trust in a federally insured interest bearing account for the benefit of the heirs at law of Sharron Williams.

The decree further provided that the guardianship funds "shall be held in trust in a federally insured account with the deposit of said sums to be acknowledged by record of deposit to be filed of record in a sealed envelope protected from public scrutiny and said funds may not be distributed prior to or without such adjudication of heirship and/or further approval and consent of this Court."

¶4. On July 21, 1995, Walter deposited $267,233 into a variable-rate savings account at the Iuka Guaranty Bank styled "Albert Jermaine Duckett and Walter J. Williams, Jr., Minors, Walter J. Williams, Guardian." A bank officer signed a "Waiver of Process and Entry of Appearance of Depository," which provided that the guardianship funds in the savings account could not be disbursed without an order of the chancery court. The officer also signed a "Receipt of Funds and Governing Court Order," in which the bank acknowledged

3

its receipt of a certified true copy of the court's decree authorizing Walter to settle the wrongful death claim.

¶5.     To prevent the disbursement of funds from accounts to which access was restricted by court order, Iuka Guaranty created a "message field" in its computer system which caused the following message – what in banking parlance is known as a "special instruction" – to appear on a teller's computer screen when an attempt was made to withdraw funds from the account: "CAUTION - WITHERAWAL [sic] - COURT ORDER ONLY."  The text of the special instruction was very conspicuous because it appeared on the screen as a reverse image with a green background; according to one Iuka Guaranty employee, the instruction was so noticeable that a teller could not overlook it.  The instruction was known as the "green worm."

¶6.     On September 7, 1995, the chancery court entered another order in the guardianship proceedings authorizing Walter to withdraw $100 per month per minor ward from the Iuka Guaranty savings account.  In February 1997, Iuka Guaranty was acquired by and merged into Bank of Mississippi (now BancorpSouth Bank).  In March BancorpSouth transferred the data in the Iuka Guaranty computer system to its own computer system as a part of the merger process.  The first step in this "system conversion" consisted of BancorpSouth's "conversion team" studying the numerous "fields"[1] in Iuka Guaranty's computer system; learning Iuka Guaranty's "field definitions" and "field codes"; and determining what data each "field" contained.  The second step involved a process known as "mapping," in which

---

[1]A "field" is a location in a bank's database where particular data is stored. The data relating to a single checking account is stored in approximately 1,600 fields.

4

the conversion team tried to match each field in the Iuka Guaranty system with a corresponding field in the BancorpSouth system. In the third and final step of the conversion, BancorpSouth electronically transferred the data in Iuka Guaranty's computer system – that is, the data stored in the fields in the Iuka Guaranty system that had been found to correspond with fields in the BancorpSouth system – to its own computer system.

¶7.     The conversion team discovered several fields in the Iuka Guaranty system that could not be transferred via automation to the BancorpSouth system. One of those fields was the field containing the data responsible for sending the green worm special instruction to tellers when an attempt was made to withdraw funds from an account with court-ordered limitations on access. Because this data could not be transferred via automation to the BancorpSouth computer system, the conversion team was forced to print out all of the data relating to the green worm instruction and then manually enter (type) this data into the BancorpSouth system. By all accounts, the conversion team successfully loaded onto the BancorpSouth system the green-worm-instruction data for every Iuka Guaranty account with court-restricted access except the guardianship savings account at issue in this case.[2] Apparently, the BancorpSouth employees responsible for the manual transfer either did not print out the data indicating that this guardianship account was subject to the green worm special instruction or skipped over the sheet containing this data during the manual transfer.

¶8.     As a result of BancorpSouth's failure to transfer this data, when Walter attempted to withdraw funds from the savings account (now at a BancorpSouth branch), the special

---

[2]Since the completion of the merger, BancorpSouth has not received any other complaints about any other data transfer errors or been sued for withdrawals from a guardianship account in violation of a court order.

5

instruction letting the teller know that access to the account was limited by a court order did not appear on the teller's computer screen.[3]  Because BancorpSouth tellers did not know that Walter, the depositor with signature authority on the account, was not allowed to access the account without restriction, he was suddenly able to withdraw much more than the court-approved $200 per month.[4]  On August 12, 1997, the savings account contained $289,562.08. By July 12, 1999, Walter had withdrawn all of the guardianship funds from the savings account.[5]  He did not appropriate all of the funds for his personal use; $109,946.45 of the withdrawn funds were spent for the benefit of both minor wards.  Walter used $39,043 of the

---

[3]The policies and procedures BancorpSouth has adopted to prevent unauthorized transactions on accounts subject to court orders are more sophisticated than the ones that were employed by Iuka Guaranty.  Although "BancorpSouth discourages the acceptance of court-appointed guardianships/conservatorships due to the liability placed on the bank to protect the assets of the individual," when such an account is opened at the bank, "special instructions must be placed on the account noting the account is a court appointed guardianship and no funds are to be released without contacting someone specifically mentioned," and a "hold for 'all funds' must be placed on the account."  Accordingly, when a person tries to withdraw funds from such an account, not only does a special instruction similar to Iuka Guranty's green worm appear on the teller's computer screen, but, more importantly, the hold on the account prevents the teller from accessing the funds in the account.  According to an expert in banking operations who testified at trial, this method of restricting access to accounts is the "best practice" in the banking industry.  Iuka Guaranty, by contrast, did not automatically place a hold on such accounts; rather, it depended on the teller following the green worm special instruction and not permitting a transaction on the account. Although Iuka Guaranty provided fewer procedural safeguards than BancorpSouth, Walter was never able to withdraw more than $200 per month from the savings account before the merger.

[4]Although the term "guardian" was in the account name, this would not have caused a teller to recognize that the account was subject to a court order.  Most guardianship accounts maintained with BancorpSouth have no court-ordered restrictions placed upon them.

[5]Walter was able to withdraw all of the funds and escape the chancery court's notice by not filing annual accountings with the court.  After filing an annual accounting with the chancery court in April 1995, Walter never filed another accounting.

6

funds to buy a house for Albert and his wife. He used another $47,000 to buy Junior a house.[6] He also executed a check payable to Albert in the amount of $7,000, so Albert could set up a bank account, and bought Albert a car for $16,903.45.

¶9. In 1999 Junior, then eighteen, entered the main BancorpSouth branch in Iuka and inquired about the guardianship funds. He discovered that the account was completely empty. On August 23, 2000, Albert reached the age of twenty-one. On July 4, 2002, Junior turned twenty-one. In 2004, Junior returned to the same BancorpSouth branch with all of the court documents relating to the guardianship and the savings account. He showed the documents to several BancorpSouth employees and demanded to know what recourse he might have. Junior was told by one bank employee that if the bank was determined to be at fault, it would compensate him.

¶10. On June 23, 2004, Junior filed this action in chancery court against his father, USF&G (Saint Paul) and BancorpSouth. His complaint alleged that his father converted the funds in the guardianship account and breached his duty as a guardian by converting the funds in violation of the orders of the chancery court. With respect to BancorpSouth, the complaint alleged that it "breached [its] duty to this Court and to [Junior] as a minor [by] allow[ing] the funds on deposit to be converted without an order of this Court." On September 22, 2004, an amended complaint was filed, adding Albert as a plaintiff to the action.

¶11. Saint Paul filed a cross-claim against BancorpSouth for the amount determined by the chancellor to be owed under the $50,000 guardianship bond it issued to Walter.

[6]Both houses were titled in the name of Walter. At the time of trial, Walter and Junior lived together in the house ostensibly bought for Junior. Moreover, Walter executed a deed of trust on both properties in favor of BancorpSouth.

7

BancorpSouth filed a motion for partial summary judgment, in which it argued that Albert's claim was barred by the general, three-year statute of limitations, Mississippi Code Section 15-1-49 (Rev. 2003). Albert and Junior responded with motions for summary judgment against BancorpSouth and Saint Paul. In their motion for summary judgment against BancorpSouth, the plaintiffs requested that the court conduct a writ of inquiry to determine the amount of actual and punitive damages owed to them by BancorpSouth.[7]

¶12. On April 15, 2005, the court heard the various motions pending before it. The court denied BancorpSouth's motion for partial summary judgment on the ground that the statute of limitations that applied to Albert's claim was Mississippi Code Section 15-1-27 (Rev. 2003), which prescribes a five-year limitations period on actions by a ward against his guardian and the guardian's sureties which begins to run on the ward's twenty-first birthday. The court granted Albert's and Junior's motion for summary judgment against Saint Paul and ordered Saint Paul to pay the $50,000 it owed under its surety bond to Albert and Junior. The court also granted Albert's and Junior's motion for summary judgment against BancorpSouth and entered judgment in their favor. The court further ruled that a writ of

---

[7]Albert and Junior should have filed a motion for assessment of damages pursuant to Rule 55(b) of the Mississippi Rules of Civil Procedure. ***Dungan v. Dick Moore, Inc.***, 463 So. 2d 1094, 1098 n.2 (Miss. 1985) ("Although technically there has been no such thing in Mississippi as a writ of inquiry since January 1, 1982, here as elsewhere we will overlook errors in nomenclature and concern ourselves with the substance of the matter. Where under our prior practice the procedure of a writ of inquiry would have been appropriate, parties may now obtain the relief formally obtainable by filing motions or commencing actions seeking such relief. We will treat the motion for writ of inquiry filed July 26, 1982 as though it were a motion for assessment of damages and we will treat the hearing of August 18, 1982 as though it were a hearing held upon the Dungan's motion for assessment of damages. See Rule 55(b) Miss. R. Civ. P.").

inquiry would be conducted to assess the amount of damages to be awarded to Albert and Junior against BancorpSouth.[8]

¶13.    After the court's ruling, BancorpSouth filed a cross-claim against Walter for the damages and attorney's fees which it might be held to owe Albert and Junior.  BancorpSouth also requested that the court require Walter to make a complete accounting of all the funds that had been deposited into the guardianship account.  Saint Paul likewise filed a cross-claim against Walter for the amount of the surety bond and its attorney's fees.  Soon thereafter, BancorpSouth and Saint Paul settled and agreed to dismiss Saint Paul's cross-claim against BancorpSouth.

¶14.    Before the hearing to assess the damages owed by BancorpSouth to Albert and Junior, the parties stipulated as to the amount of money both Albert and Junior would have received on their twenty-first birthdays if their father had not misappropriated any of the guardianship funds.  They calculated that Albert would have received $144,747.60 and Junior would have received $146,038.66.  After conducting the damages hearing, on June 16, 2006, the court issued its ruling on damages and awarded Albert and Junior actual damages in the amount of $207,833[9], prejudgment interest in the amount of $347,385.62, attorney's fees of $222,087.44 and $1,000,000 in punitive damages.  On August 17, 2006, the court issued its

[8]The court entered an order reflecting these rulings on May 3, 2005.  The order states: "[T]his Order does not constitute a final judgment in this case.  Final judgment will be entered separately following the proceedings on the writ of inquiry."

[9]The chancellor computed the actual damages by subtracting the money recovered by Albert and Junior from Saint Paul ($50,000) and the $200 per month that Walter withdrew from the account with court authorization from September 7, 1995 until July 1999 ($9,400) from the amount of the original deposit ($267,233).

final rulings on all matters. In its final judgment, the court incorporated its previous ruling on the damages owed by BancorpSouth; entered judgment for Albert and Junior against Walter in the amount of $777,306.06; entered judgment for Saint Paul against Walter and awarded Saint Paul $23,975 in attorney's fees and $1,268.80 for costs; and entered judgment for BancorpSouth against Walter in the amount of $1,900,566.06. Additionally, the court divested Walter of title to the two properties he bought with the guardianship funds, transferred the two properties to the chancery clerk and ordered the chancery clerk to vest in Albert and Junior title to the property that each occupied. The court also credited BancorpSouth $6,825.66 for the taxes and insurance it paid for two years on the two homes purchased by Walter and the amount still owed under the deeds of trust. Accordingly, the amount awarded the plaintiffs against BancorpSouth was reduced from $1,777,306.06 to $1,770,480.40. BancorpSouth now appeals the judgment entered by the chancery court against it in favor of Albert and Junior.

## DISCUSSION

### Standard of Review

¶15. A chancery court's interpretation and application of the law are reviewed de novo. *Weissinger v. Simpson*, 861 So. 2d 984, 987 (Miss. 2003). Our review of a chancery court's grant of summary judgment is de novo as well. *Anglado v. Leaf River Forest Prod.*, 216 So. 2d 543, 547 (Miss. 1998). A chancery court's findings of fact will not be reversed if the record contains substantial evidence supporting those findings. *UHS-Qualicare, Inc. v. Gulf Coast Cmty. Hosp., Inc.*, 525 So. 2d 746, 753 (Miss. 1987). An award of prejudgment

10

interest is reviewed for abuse of discretion. ***Aetna Cas. & Sur. Co. v. Doleac Elec. Co.***, 471 So. 2d 325, 331 (Miss. 1985).

**I. Did the chancery court err in granting Albert summary judgment?**

¶16.    BancorpSouth argues that Albert's claim is barred because it was not filed within the general, three-year statute of limitations, Mississippi Code Section 15-1-49 (Rev. 2003), and thus the chancery court erroneously granted him summary judgment.  It requests that this Court reverse the chancery court's grant of summary judgment to Albert and render judgment in its favor.[10]

¶17.    The chancery court agreed with Albert and held that the statute of limitations that applied to his claim against BancorpSouth was Mississippi Code Section 15-1-27 (Rev. 2003), not Section 15-1-49.  Section 15-1-27 provides: "All actions against a guardian and the sureties on his bond, or either of them, by the ward, shall be commenced within five years next after the ward shall have arrived at the age of twenty-one years, and not after."  Miss. Code Ann. §15-1-27 (Rev. 2003).  The court never explained its rationale for holding that Section 15-1-27 was the applicable statute of limitations, but it appears that the court accepted Albert's argument that BancorpSouth was a "de facto bonding company," pursuant to Mississippi Code Section 93-13-17 (Rev. 2004), the statute which requires every guardian to post a bond with a surety.  Section 93-13-17 provides in relevant part:

> A guardian need not enter into bond, however, as to such part of the assets of the ward's estate as may, pursuant to an order of the court in its discretion, be deposited in any one or more banking corporations, building and loan

---

[10]To be clear, BancorpSouth does not appeal the chancery court's grant of summary judgment to Junior.

11

associations or savings and loan associations in this state so long as such deposits are fully insured, such deposits there to remain until further order of the court, and a certified copy of the order for deposit having been furnished the depository or depositories and its receipt acknowledged.

Miss. Code Ann. §93-13-17 (Rev. 2004).[11] Albert argues that, because this provision allows a court to limit the amount of the bond into which a guardian must enter to the extent that the deposited guardianship funds are insured ($100,000 in deposit insurance from the Federal Deposit Insurance Corporation (FDIC), *see* 12 U.S.C. §1821(a)(1)(E)), the bank in which the guardianship funds are deposited acts as a surety to the same extent.

---

[11]Section 93-13-17 provides in its entirety:

Every guardian, before he shall have authority to act, shall, unless security be dispensed with by will or writing or as hereinafter provided, enter into bond payable to the state, in such penalty and with such sureties as the court may require; and the bond shall be recorded and may be put in suit for any breach of the condition, whether the appointment be legal or not; and the condition shall be as follows:

"The condition of the above obligation is that if the above bound ___, as guardian of ___, of ___ County, shall faithfully discharge all the duties required of him by law, then the above obligation shall cease."

And the guardian shall also take and subscribe an oath, at or prior to the time of his appointment, faithfully to discharge the duties of guardian of the ward according to law.

A guardian need not enter into bond, however, as to such part of the assets of the ward's estate as may, pursuant to an order of the court in its discretion, be deposited in any one or more banking corporations, building and loan associations or savings and loan associations in this state so long as such deposits are fully insured, such deposits there to remain until the further order of the court, and a certified copy of the order for deposit having been furnished the depository or depositories and its receipt acknowledged.

Miss. Code Ann. §93-13-17 (Rev. 2004).

¶18.    If a statute is not ambiguous, this Court must apply the statute according to its plain meaning. *Miller v. Meeks*, 762 So. 2d 302, 305 (Miss. 2000) (citation omitted). We find that Section 93-13-17 is clear and unambiguous. The statute makes a clear distinction between sureties and depositories; it treats them as two completely different entities that perform completely different functions. A surety issues the bond to the guardian and will be held liable on the bond if the guardian does not "faithfully discharge all the duties required of him by law." Miss. Code Ann. §93-13-17 (Rev. 2004). Depositories, on the other hand, are "banking corporations, building and loan association[s] or savings and loan associations[,]" into which a guardian may deposit the "assets of the ward's estate." *Id.* The statute does not state that a depository holding any portion of the assets of the ward's estate functions as a surety with respect to those assets; the plain meaning of the statute is not that a depository can be held liable for the deposited funds if it allows the guardian to misappropriate them. Accordingly, we hold that BancorpSouth is not (and should not have been treated as) a surety, and that Section 15-1-27 is therefore not the applicable statute of limitations.

¶19.    Albert argues, in the alternative, that Mississippi Code Section 15-1-43 (Rev. 2003) is the statute of limitations that applies to his claim. Section 15-1-43 states:

> All actions founded on any judgment or decree rendered by any court of record in this state, shall be brought within seven years next after the rendition of such judgment or decree, and not after, and an execution shall not issue on any judgment or decree after seven years from the date of the judgment or decree.

Miss. Code Ann. §15-1-43 (Rev. 2003). Albert argues that Section 15-1-43 is the applicable statute of limitations because his claim is based on BancorpSouth's violation of the chancery court's decree authorizing the settlement of the wrongful death claim and ordering that the

13

guardianship funds not be disbursed without the approval of the court. Although a chancery court's "decree" is the equivalent of a circuit court's "judgment at law," the decree issued by the chancery court authorizing Walter to settle the wrongful death claim was not a "decree" within the meaning of Section 15-1-43. Miss. Code Ann. §11-5-79 (Rev. 2002) ("The decree of a court of chancery shall have the force, operation, and effect of a judgment at law in the circuit court."). The chancery court's decree did not give Albert any affirmative relief upon which he could execute or make him a judgment creditor. Therefore, Section 15-1-43 is not the applicable statute of limitations.

¶20. The statute of limitations that applies to Albert's claim against BancorpSouth is the three-year statute of limitations, Mississippi Code Section 15-1-49 (Rev. 2003). His claim against BancorpSouth accrued – and the limitations period began to run – when he turned twenty-one on August 23, 2000. Junior filed the original complaint on June 13, 2004. The amended complaint joining Albert as a plaintiff was not filed until September 22, 2004, more than four years after he turned twenty-one. Thus, Albert's claim is barred because it was not filed within the three-year limitations period. Accordingly, the chancery court erred by granting Albert summary judgment.

**II. Did the chancery court err in not reducing the actual damages awarded against BancorpSouth by the amount of the unauthorized expenditures made by Walter for the benefit of the wards?**

¶21. BancorpSouth argues, based on the case of *United States Fidelity & Guaranty Company v. Melson*, 809 So. 2d 647 (Miss. 2002), that the chancery court committed error by not crediting it for the guardianship funds that Walter spent on Albert and Junior. In that case, an automobile accident left Melson, an adult woman, severely injured and in a coma.

14

*Id.* at 649. Two conservatorships were created for her – one in Mississippi and one in Massachusetts. *Id.* at 649-50. Although she emerged from the coma and regained her mental competency, the conservatorships continued on account of her physical incapacity. *Id.* at 649. The Mississippi conservator disbursed, without court approval, $108,666.03 of the money Melson received in a settlement stemming from the accident. *Id.* at 650. The Massachusetts conservator filed suit against the Mississippi conservator in Mississippi, seeking recovery of all the unauthorized disbursements. *Id.* The parties stipulated that $62,961.71 was paid directly to Melson. *Id.* Moreover, $36,686.26, although it went to third parties, was expended for the benefit of Melson, including $22,000 that was paid to her former husband and his attorney pursuant to the decree granting them their divorce. *Id.* The chancery court, nevertheless, ruled in favor of the Massachusetts conservator and entered judgment against the Mississippi conservator's surety (USF&G) for the full amount of the unauthorized disbursements. *Id.* at 649. On appeal, this Court held that even though the Mississipppi conservator made the payments without court approval, the chancery court erred in not giving the surety credit for the $62,961.71 paid directly to Melson and the $22,000 paid to her former husband and his attorney. *Id.* at 660-61. This Court stated:

> [F]orcing USF&G to repay all of the expenditures would create a windfall to Melson and produce inequitable results. Nothing in the record supports a finding that the payment of the $ 62,961.71 to Melson and the $ 22,000 pursuant to the divorce decree was driven by dishonesty on the part of [the Mississippi conservator] or that it resulted in mismanagement of the estate.

*Id.* at 661. This Court then reduced the chancery court's award of $108,666.03 by $84,961.71. *Id.* at 661.

¶22. The facts of the present case are very similar to the facts in *Melson*. Walter, like the Mississippi conservator in *Melson*, expended, without court approval, a significant portion of the wards' assets for the direct benefit of the wards. The uncontradicted evidence presented during the hearing on damages establishes that a total of $109,946.45 of Walter's unauthorized disbursements benefitted Albert and Junior. Walter used $55,946.45 to purchase a car and a house for Albert and gave $7,000 directly to Albert to open a bank account. Walter also spent $47,000 to buy Junior a house.

¶23. Since Albert's claim is time-barred and the judgment rendered in his favor against BancorpSouth must be reversed, there is no need to consider whether the judgment, as it relates to him, should be reduced by the amount of unauthorized payments made for his benefit. As for the $47,000 used to purchase a house for Junior, we must, in accordance with *Melson*, give BancorpSouth credit on the judgment for this expenditure. To not credit BancorpSouth would result in Junior being unjustly enriched, especially since title to the house is now vested in him as a result of the chancery court's final judgment. Accordingly, we reduce the chancery court's award of actual damages to Junior by $47,000.

### III. Did the chancery court err in awarding punitive damages against BancorpSouth?

¶24. In its bench ruling, the chancery court explained its rationale for awarding punitive damages as follows:

> The Court finds that there was, on the part of BancorpSouth, a reckless disregard and/or gross negligence [sic] in the disbursement of funds in violation of a court order. This Court finds that the plaintiffs are entitled to punitive damages in this case because of that violation of that court order.

16

BancorpSouth argues that the chancery court's imposition of punitive damages was in error because (1) the plaintiffs did not prove by clear and convincing evidence that it acted with gross negligence in allowing their father to withdraw all of the guardianship funds from the savings account without the authorization of the court, and (2) punitive damages are not an appropriate remedy for the violation of a court order.

¶25.   Mississippi Code Section 11-1-65 governs the awarding of punitive damages.  It provides that:

> Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

Miss. Code Ann. §11-1-65(a)(1) (Rev. 2002).  This Court has stated that "[g]ross negligence is that course of conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them." *Dame v. Estes*, 233 Miss. 315, 318, 101 So. 2d 644, 645 (1958).  On the other hand, "simple negligence is not of itself evidence sufficient to support punitive damages . . . ." *Choctaw Maid Farms v. Hailey*, 822 So. 2d 911, 924 (Miss. 2002) (citation omitted).

¶26.   The undisputed evidence presented at the hearing on damages establishes that BancorpSouth's failure to successfully transfer the special instruction data relating to the guardianship savings account from the Iuka Guaranty computer system to its own computer system was the result of an honest mistake: the BancorpSouth conversion team either did not print out the special instruction data on this account or overlooked the sheet containing this data during the manual transfer of the data.  Paul Carruba, an expert in banking operations,

17

gave the following testimony at the writ of inquiry about the failure to transfer the special instruction data:

> It's my understanding that this one account that's the subject of this lawsuit that had the special instructions at Iuka bank, for some reason, through human error, the information was not loaded to the BancorpSouth system. . . . The information was not there. So through this human error that was made on the date of conversion by being left off or skipped over from the report, the manual report that was generated, the information was not loaded on the system.

Carruba also testified about the quality of the BancorpSouth's conversion plan as follows: "[T]his plan is a very comprehensive plan. I, also, in determining the effectiveness of this plan, look at the history that the bank has had over a number of years and the number of consolidations. . . . Those plans have been very successful." The record reflects, moreover, that the BancorpSouth conversion team transferred the special instruction data for all of the Iuka Guaranty accounts subject to the green worm instruction, except for the savings account at issue in this case; and that, in the more than forty-five other system conversions that BancorpSouth had conducted, this error had never occurred. We find, therefore, that BancorpSouth's failure to transfer the special instruction data on the guardianship account at issue in this case was, at most, the result of simple negligence and thus cannot support an award of punitive damages.

¶27. With respect to BancorpSouth's conduct after the conversion, the chancery court found that the bank knowingly allowed Walter to withdraw all of the guardianship funds without court approval: "I don't think there was any concealing of it; there was just an ignoring of it. But there was duration of it for years in allowing the guardian to withdraw these funds in violation of a court order." No evidence was presented during the damages

18

hearing which indicated that any BancorpSouth employee ever had any knowledge that the withdrawals made by Walter violated any court order. On the contrary, the evidence submitted and testimony given during the hearing clearly establishes that, during the time period (1997-99) in which Walter withdrew all of the guardianship funds, BancorpSouth officials and employees were not aware that, by allowing Walter to withdraw more than $200 per month from the savings account, the bank was violating a court order. Cathy Talbot, BancorpSouth's Vice President of the Corporate Security Department, testified that, because the special instruction data for this savings account was not transferred to the BancorpSouth computer system, no BancorpSouth employee knew that this account was subject to a court order limiting the amount of money that could be withdrawn and that Walter was violating that court order. The following exchange took place between BancorpSouth's attorney and Talbot:

> [BancorpSouth's attorney]: What then is the – explain to the Court what then is the difference between the circumstance that existed while the account was an Iuka Guaranty Account and the circumstance that existed after it was converted over to BancorpSouth?
>
> [Talbot]: The difference is the special instructions or holds were not on the account. They were not indicated on the bank system so if any employee reviewed that account, they would not have been aware of any restrictions.
>
> Q: When you say reviewed the account, you mean reviewed the account as indicated on the system? Is that right?
>
> A: Right.
>
> Q: After conversion of the account from Iuka Guaranty over to BancorpSouth, and based on the information that was on the BancorpSouth system, did it appear to BancorpSouth that it was handling these accounts correct [sic]?
>
> A: Yes, sir. Mr. Williams, Sr. was making all of the withdrawals.

19

Q: Why did – why did it appear that it was being handled correctly?

A: There again there weren't any special instructions to tell us otherwise.

Q: Now, is it – is the bank's contention that everything happened the way it was supposed to happen?

A: No, sir. I mean, there should have been special instructions and monetary holds on the account.

Q: Did BancorpSouth, in this case, ever intentionally violate any court order?

A: No, sir. I don't know that we ever have.

Q: Did BancorpSouth, in this case, ever willfully violate any court order?

A: No, sir.

Q: Or knowingly violate it?

A: No, sir.

Carruba's testimony lent support to the claims of Talbot:

> After the conversion, because the account was not flagged, the bank did allow withdrawals to be made from the account without court order because the bank was not aware that the court order was required, at least the tellers that handled the transactions were certainly not aware because the screen did not have the information that would have alerted them to the fact that the account required a court order.

¶28. It is true that BancorpSouth retained the physical file for the guardianship account, which contained a copy of the first page of the decree authorizing Walter to settle the wrongful death claim, a copy of the $267,233 check used to open the account, and a copy of the order authorizing Walter to withdraw $200 per month from the account. But no evidence was presented that suggested that any BancorpSouth employee was aware of the contents of the physical file during the time in which Walter was withdrawing all of the money. Indeed,

20

it appears from our review of the record that BancorpSouth did not become aware that this account was subject to a court order until 2004, when Junior, armed with all of the legal documents relating to the guardianship, entered the main branch in Iuka and inquired about recovering the guardianship funds. No BancorpSouth employee ever looked in the account file because the information contained in the account file was presumed to have been entered into the computer system. According to Carruba, it is a standard banking practice for bank employees to not consult the account files and instead rely exclusively on the information contained in the computer system. He testified as follows on cross-examination:

> [Albert and Junior's attorney]: Okay. Well, if the bank, BancorpSouth, or if the bank, I'll call it the bank, had paid attention to the legal file that you are talking about, that you had like at Deposit Guaranty National Bank, isn't it true that if they had reviewed that file that this would have been prevented?
>
> [Carruba]: No, sir, it would not have. I would – I would not have looked at a manual file during the process of a conversion.
>
> Q: You would not have?
>
> A: No, sir. Because the system maintained the information. Again, I started off my testimony earlier by saying that once the account is open, that paper, as far as notifying the bank, has no significance as far as the notification, it's done through automation. The screen alerts the bank to the fact that there is – are special instructions relative to that account, that withdrawals are required by court order only. That's what brings the teller to the attention, not document [sic] in the file somewhere.
>
> Q: So when you are going through this merger, it wouldn't be necessary, you are telling this Court, it wouldn't be necessary to pull out the file, check the court order, check your representations or the bank's representations to the court to make a determination that the bank was doing exactly what the court order said?
>
> A: It's not part of a merger process. No, sir. Again, that information was already on a screen at Iuka bank, special instructions, court order – what the

21

court order required for withdrawals. That's where the bank would look, and that's where they did look.

Based on the foregoing, we find that the record does not contain substantial evidence that BancorpSouth acted with gross negligence after the conversion by allowing Walter to withdraw all of the guardianship funds from the savings account. Therefore, the chancery court erred by finding that BancorpSouth's post-conversion conduct warranted the imposition of punitive damages.

¶29. The fact that BancorpSouth violated a court order is also not a ground upon which the award of punitive damages in this case can be justified. In *Moulds v. Bradley*, 791 So. 2d 220 (Miss. 2001), a mother sought punitive damages against the her child's father, who had been found guilty of criminal contempt for not paying court-ordered child support. *Id.* at 223-24. This Court held that the chancery court did not err in denying the mother's claim for punitive damages, stating:

> There is no precedent in this State's jurisprudence for the award of punitive damages as a sanction for failing to pay child support. Moreover, [the mother] does not cite any authority from other jurisdictions in support of this practice. After a diligent search, we could find only one court awarding punitive damages for criminal contempt, which was deemed a fine, payable to the court, not the opposing party.

*Id.* at 226-27. The appropriate remedy for the violation of a court order is a citation for contempt.[12] *E.g., In re Hoppock*, 849 So. 2d 1275, 1279 (Miss. 2003). Accordingly, the chancery court erred in awarding punitive damages against BancorpSouth.

---

[12]However, it would have been inappropriate for BancorpSouth to have been cited for contempt because it did not willfully violate a court order. *E.g., Bredemeier v. Jackson*, 689 So. 2d 770, 777 (Miss. 1997) ("A citation for contempt is proper only when the contemner has willfully and deliberately ignored the order or the court.") (citations omitted).

**IV. Did the chancery court err in awarding attorney's fees to the plaintiffs?**

¶30.  The law in Mississippi with respect to the awarding of attorney's fees is well settled: "[I]f attorney's fees are not authorized by the contract or by statute, they are not to be awarded when an award of punitive damages is not proper." *Hamilton v. Hopkins*, 834 So. 2d 695, 700 (Miss. 2003) (collecting authorities).  There is no contract between BancorpSouth and the plaintiffs which provides for the recovery of attorney's fees; nor is there any statute upon which an award of attorney's fees in this case could be based.  Thus, the chancery court's award of attorney's fees can only be upheld if its punitive damages award is proper.  Because we conclude that the chancery court's award of punitive damages was in error, its award of attorney's fees was in error as well.

**V. Did the chancery court err in its calculation of prejudgment interest?**

¶31.  The chancery court awarded Albert and Junior prejudgment interest in the amount of $347,385.62.  In its order awarding damages against BancorpSouth, the court stated that the amount of prejudgment interest awarded was "derived from calculating 8% annual compounded interest on $267,233 from July 21, 1995 until May 15, 2006."  July 21, 1995, was the date the $267,233 was deposited into the savings account, and May 15, 2006, was the last day of the hearing on damages.

¶32.  BancorpSouth argues that the chancery court erred by not calculating prejudgment interest at the variable interest rate earned by the savings account in which the guardianship funds were deposited.  Specifically, it contends that the chancery court's judgment is based on the savings account agreement between the parties, and, therefore, prejudgment interest should have been, under Mississippi Code Section 75-17-7, calculated at the contract

23

rate—which it asserts was a variable interest rate that over time ranged from .75% to 3%. BancorpSouth also asserts that the chancery court erred by calculating prejudgment interest from the date of the original deposit. It claims that it should have been calculated from the date of the original deposit until each ward's twenty-first birthday. In the event that the contract rate is found not to apply, BancorpSouth argues that the chancery court erred by calculating prejudgment interest from "a date . . . prior to the filing of the complaint" and by compounding the prejudgment interest. Miss. Code Ann. §75-17-7 (Rev. 2000).

¶33.    Mississippi Code Section 75-17-7 governs the awarding of prejudgment interest. *See, e.g.*, *Am. Fire Prot., Inc. v. Lewis*, 653 So. 2d 1387, 1392 (Miss. 1995). The statute provides:

> All judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.

Miss. Code Ann. §75-17-7 (Rev. 2000). The first question that must be answered is whether the chancery court's judgment against BancorpSouth was "founded" on the savings account agreement. Albert and Junior did not allege in their complaint that BancorpSouth breached the savings account agreement; rather, they alleged that BancorpSouth "breached [its] duty to [the] Court and to them as minors and allowed the funds on deposit to be converted without an order of this Court." Moreover, the chancery court found BancorpSouth's failure to comply with the court orders limiting Walter's access to the guardianship funds to be the sole basis for the judgment against BancorpSouth. In its bench ruling granting Albert's and Junior's motion for summary judgment against BancorpSouth, the court stated:

24

> Now, at that point in time, the execution of that order by the chancellor and the acceptance of these funds that I have noted here in the earlier part of this opinion, this bank became subject to their own appearance and entry of appearance and waiver of process, they became as of the 31st day of July, 1995, the depository for these funds. And they became, in the opinion of this Court, liable for their disbursement.

At no point during its bench ruling did the chancery court mention the savings account agreement. Additionally, the savings account agreement is just a standard agreement that contains no provision pertaining to the court-ordered restriction on access to the funds in the account. Accordingly, BancorpSouth's contention that the chancery court erred by not calculating prejudgment interest at the contract rate is without merit.

¶34. Although the chancery court correctly calculated prejudgment interest at a per annum rate that it determined was proper (8%), we find merit in BancorpSouth's argument that the court erred in awarding prejudgment interest from July 21, 1995, the date of the original deposit. Under Section 75-17-7, if the judgment of the lower court is not based on a contract or note, and the lower court decides to award prejudgment interest at "a per annum rate set by [it]," it may only calculate that interest "from a date determined by [the court] to be fair but in no event prior to the filing of the complaint." Miss. Code Ann. §75-17-7 (Rev. 2000). Therefore, the chancery court erred in calculating prejudgment interest from a date prior to the filing of the complaint.

¶35. Finally, BancorpSouth argues that the chancery court erred by awarding compounded prejudgment interest. As authority for compounding the prejudgment interest, the court partly relied on a decree entered by it in 1984 that was affirmed per curiam by this Court.

25

*In re Guardianship of Helton*, 480 So. 2d 1165 (Miss. 1985).[13]  This Court has stated that

"trial courts are not free to decide issues according to authority found in unpublished [trial]

court opinions."  *Federated Mut. Ins. Co. v. McNeal*, 943 So. 2d 658, 661-62 (Miss. 2006).

Accordingly, the chancery court clearly erred by relying on this decree as authority for its

decision to compound the prejudgment interest.

¶36.    The chancery court also relied on the case of *Jones v. Parker*, 216 Miss. 64, 61 So.

2d 681 (1952).  In *Jones* this Court stated that "[c]ompound interest ordinarily is chargeable

in cases of fraud, gross negligence, or abuse of trust *on the part of the guardian*, but only

simple interest will be charged in cases of simple neglect of duty without fraud or intentional

misconduct."  *Id.* at 71-72, at 683 (emphasis added).  Because this Court was speaking of the

method of calculating the prejudgment interest owed by a guardian who has converted the

guardianship funds, rather than the depository of the guardianship funds, we find *Jones* to

be inapposite. *See id.*  Moreover, the evidence clearly establishes that BancorpSouth was not

grossly negligent and did not engage in fraud or intentional misconduct.  Therefore, we find

that BancorpSouth's *actions* do not warrant an award of compounded prejudgment interest.

However, since Mississippi Code Section 75-17-7 governs the awarding of prejudgment

---

[13]*Helton* involved facts similar to the ones in this case.  Four wards filed suit against their guardian and the savings and loan association in which the guardian deposited the guardianship funds for misappropriation of the funds.  Apparently, the savings and loan association took almost all of the guardianship funds to pay off a loan it had made to the guardian in his individual capacity.  The Chancery Court of Tishomingo County granted summary judgment to the wards and awarded them prejudgment interest compounded quarterly.

interest, we must examine whether it authorizes a lower court to award compounded prejudgment interest.

¶37.   If a statute is plain and unambiguous, there is no need for this Court to engage in statutory interpretation.  *DuPree v. Carroll*, 967 So. 2d 27, 30 (Miss. 2007) (citation omitted).  On the other hand, if a statute is ambiguous or silent on a specific issue, statutory interpretation is appropriate.  *Id.*  "The primary rule of construction is to ascertain the intent of the legislature from the statute as a whole and from the language used therein."  *Bailey v. Al-Mefty*, 807 So. 2d 1203, 1206 (Miss. 2001) (quoting *Clark v. State ex rel. Miss. State Med. Ass'n*, 381 So. 2d 1046, 1048 (Miss. 1980)).  But "the [C]ourt, in determining the legislative intent, may look not only to the language used but also to its historical background, its subject matter, and the purposes and objects to be accomplished."  *Id.*  "Unthought of results must be avoided if possible, especially if injustice follows, and [an] unwise purpose will not be imputed to the Legislature when a reasonable construction is possible."  *Evans v. Boyle Flying Serv., Inc.*, 680 So. 2d 821, 825 (Miss. 1996) (internal quotation and citation omitted).

¶38.   The portion of Section 75-17-7 that is relevant to this case reads as follows: "All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint."  Miss. Code Ann. §75-17-7 (Rev. 2000).  We find that Section 75-17-7 is silent on the specific issue of whether a trial court is authorized to calculate prejudgment interest as compound interest.  Accordingly, we must ascertain the intent of the legislature regarding the method of calculating prejudgment interest.

27

¶39. The statute clearly grants trial courts the discretion to set the rate of prejudgment interest: "All other judgments or decrees shall bear interest *at a per annum rate set by the judge . . . ."* Miss. Code Ann. §75-17-7 (Rev. 2000). The fact that Section 75-17-7 grants trial courts the discretion to set the rate of prejudgment interest suggests that the legislature also intended in enacting this statute to grant trial courts the discretion to calculate prejudgment interest on a simple or compound basis. *See Lindsey v. Lindsey*, 219 Miss. 540, 546, 69 So. 2d 203, 205 (1954) ("That which is implied in the statute is as much a part of it as that which is expressed.") (internal quotation marks and citations omitted); *Peets v. Martin*, 135 Miss. 720, 729, 101 So. 78, 80 (1924) (holding that powers not expressly granted by statute may "arise by implication"). In fact, our Court of Appeals stated that "Section 75-17-7 . . . allows the trial court to set the rate and in effect the method of its calculation." *Estate of Baxter v. Shaw*, 797 So. 2d 396, 407 (2001). *See also Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002) (holding that trial court's discretion to select rate of prejudgment interest includes "lesser authority" to compound such interest) (internal quotation marks and citation omitted).

¶40. The purpose of Section 75-17-7 is to allow parties to recover both prejudgment and post-judgment interest. *See, e.g.*, *U.S. Fid. & Guar. Co. v. Estate of Francis ex rel. Francis*, 825 So. 2d 38, 50 (Miss. 2002); *Fred's Stores of Miss., Inc. v. M & H Drugs, Inc.*, 725 So. 2d 902, 921 (Miss. 1998). The purpose of prejudgment interest is to provide parties with "compensation for the detention of money overdue." *Sunburst Bank v. Keith*, 648 So. 2d 1147, 1153 (Miss. 1995) (quoting *Rubel v. Rubel*, 221 Miss. 848, 75 So. 2d 59, 69 (1954)). Stated another way, "[prejudgment] interest compensates for the time value of money, and

28

thus is often necessary for full compensation." ***Motion Picture Ass'n of Am. v. Oman***, 969

F.2d 1154, 1157 (D.C. Cir. 1992). *See generally* Anthony E. Rothschild, Comment,

*Prejudgment Interest: Survey and Suggestion*, Nw. U. L. Rev. 192 (1982) ("If a judgment,

years after the fact, provides only the amount of damage sustained by the claimant at the time

of the incident, the claimant will have lost the opportunity to invest the amount of the

damages and to earn a return on that investment. His compensation will not be complete, for

he has not recovered damages for the opportunity costs incurred between the time of injury

and the time of judgment.").

¶41.   Many courts have held that, in order for an award of prejudgment interest to fully

compensate a party for the time value of the overdue money, such interest must be

compounded.  *See, e.g.*, ***Cement Div., Nat'l Gypsum Co. v. City of Milwaukee***, 144 F.3d

1111, 1115 (7th Cir. 1998); ***Saulpaugh v. Monroe Cmty. Hosp.***, 4 F.3d 134, 145 (2nd Cir.

1993); ***U.S. v. 429.59 Acres of Land***, 612 F.2d 459, 465 (9th Cir. 1980); ***Mars, Inc. v. Coin***

***Acceptors, Inc.***, 513 F. Supp. 2d 128, 137 (D.N.J. 2007) (citation omitted); ***In re Air Crash***

***near Nantucket Island***, 462 F. Supp. 2d 360, 370 n.12 (E.D.N.Y. 2006) (citation omitted).

One court has even argued that compound interest should always be awarded.  ***ONTI, Inc.***

***v. Integra Bank***, 751 A.2d 904, 929 (Del. Ch. 1999) ("The grounds for the rule of simple

interest are at best the inability of a prudent investor to receive compound interest and are at

worst a blind adherence to the past.").

¶42.   Because it is necessary to compound prejudgment interest in order to compensate for

the time value of the money due as damages from the date the claim arises to the date the

judgment is entered, it would be unreasonable to interpret Section 75-17-7 as only providing

trial courts with the authority to award simple prejudgment interest. Therefore, we interpret Section 75-17-7 as granting trial courts the discretion to award simple or compound prejudgment interest  Accordingly, we hold the chancery court did not abuse its discretion by awarding prejudgment interest at the rate of eight percent per annum, compounded annually.

**VI. Did the chancery court err in allowing Walter to testify during  hearing on damages?**

¶43.   Because we are reversing the judgment of the chancery court as to Albert and rendering judgment in BancorpSouth's favor, and because BancorpSouth does not seek reversal of the chancery court's judgment as it relates to Junior, we find this issue to be moot and thus will not address it.

**VII. Did the chancery court err in not abiding by the parties' stipulations of fact regarding the amount of money Albert and Junior would have received from the guardianship account if none of the guardianship funds had been withdrawn without court authorization?**

¶44.   Pursuant to Rule 28(a)(3) of the Mississippi Rules of Appellate Procedure, "the Court may, at its option, notice a plain error not identified or distinctly specified."  M.R.A.P. 28(a)(3).  Plain-error review is appropriate when (i) a party has failed to preserve an error for appellate review and (ii) a substantial right is affected.  *State Highway Comm'n of Miss. v. Hyman*, 592 So. 2d 952, 957 (Miss. 1991).  A monetary interest is a substantial right.  *Id.* The chancery court's failure to abide by the parties' stipulations of fact regarding the amount of money Albert and Junior would have received on their twenty-first birthdays from the guardianship account affects the amount of actual damages owed by BancorpSouth. Therefore, plain-error review is warranted.

30

¶45.    The parties stipulated prior to the hearing on damages that, had Walter withdrawn only the court-authorized amount from the guardianship account each month, Albert would have received $144,747.60 on August 23, 2000, his twenty-first birthday, and Junior would have received $146,038.66 on July 4, 2002, his twenty-first birthday.   In **Wilbourn v. Hobson**, 608 So. 2d 1187 (Miss. 1992), this Court stated the following about stipulations:

> [C]ourts, both trial and appellate, . . . are bound by stipulations in respect of matters which may validly be made the subject matter of stipulations. Courts are bound to enforce stipulations which parties may validly make, where they are not unreasonable or against good morals or sound public policy. Ordinarily they have no power to . . . go beyond the terms [of such stipulations) . . . or to make findings contrary to the terms of a stipulation, or render a judgment not authorized by its terms.

*Id.* at 1189-90 (quoting 83 C.J.S. *Stipulations* §17 (1953)).   The chancery court awarded Albert and Junior $207,833 in actual damages.   The court arrived at this amount by subtracting from the $267,233 that was originally deposited by Walter into the guardianship account the $50,000 Albert and Junior recovered from Saint Paul and the $9,400 Walter withdrew from the account with court authorization.  By starting its calculation of actual damages with the amount of the original deposit, instead of the stipulated amounts Albert and Junior would have received upon turning twenty-one, the chancery court failed to abide by the parties' stipulations of fact and therefore erred in awarding $207,833 in actual damages.

¶46.    The chancery court should have calculated Albert and Junior's actual damages separately, since they would have received different amounts of money from the guardianship account.  Because Albert's claim is barred, we will not address how the court should have calculated his actual damages.  With respect to Junior's actual damages, the court should have taken the stipulated amount of money he would have received from the

31

guardianship account on his twenty-first birthday ($146,038.66) and subtracted from it the $25,000 he recovered from Saint Paul and the $47,000 Walter used to buy him a house. Accordingly, the chancery court should have awarded Junior $74,038.66 in actual damages.

## CONCLUSION

¶47.    The chancery court's judgment as to Albert is reversed, and judgment is rendered for BancorpSouth on Albert's claims.  The chancery court's judgment is also reversed and rendered as to punitive damages and attorney's fees.  Finally, the chancery court's award of actual damages to Junior is reduced by $29,877.84 to $74,038.66, and this case is remanded to the chancery court for a recalculation of the prejudgment interest owed Junior on the reduced amount of his actual damages from a date not prior to the filing of the original complaint that the court determines to be fair.

¶48.    **REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.**

**SMITH, C.J., CARLSON, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR.  EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WALLER, P.J., AND LAMAR, J., NOT PARTICIPATING.**

32