# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00780-COA

JULIUS ATKINS                                                    APPELLANT

v.

JUDITH HOLDER MOORE                                              APPELLEE

DATE OF JUDGMENT:                06/18/2021
TRIAL JUDGE:                     HON. JOSEPH N. STUDDARD
COURT FROM WHICH APPEALED:       LOWNDES COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:         DEWITT T. HICKS JR.
                                 LYDIA QUARLES
ATTORNEY FOR APPELLEE:           JUDITH HOLDER MOORE (PRO SE)
NATURE OF THE CASE:              CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:                     AFFIRMED - 12/06/2022
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Judith Holder Moore was appointed to serve as conservator for her sister, Barbara Holder Atkins (Atkins), who was suffering from dementia and living in a local assisted living facility. One of Atkins's two living sons, Julius Atkins (Julius), subsequently entered an appearance in the case, objected that Moore had failed to serve him with process, and sought to remove Moore as a conservator. After lengthy proceedings, a series of pretrial hearings, and a trial, the chancery court entered a final judgment approving Moore's final accounting and finding that Moore had not misspent or converted any of Atkins's funds. The court also appointed a new permanent conservator (a local attorney), as the court had already granted Moore's request to be discharged as conservator. Julius appealed.

¶2. On appeal, Julius argues that Moore failed to comply with the law by failing to serve him with her petition for a conservatorship, that she falsely accused him of a crime against his mother (exploitation of a vulnerable adult), that her annual and final accountings were insufficient, and that she violated a court order by failing to increase her bond. Although we agree with Julius that Moore failed to comply with the law when she failed to serve him with process, we hold that Moore's failure is not reversible error. Like the chancellor, we conclude that Moore's testimony regarding Julius's financial exploitation of his mother stands uncontradicted because Julius failed to testify at trial or offer any other evidence to the contrary. Also like the chancellor, we agree with Julius that Moore's accountings contained insufficient detail; however, we cannot say that the chancellor abused his discretion by approving the final accounting and discharging Moore as conservator. Finally, we find that Moore's failure to increase her bond does not require reversal. Accordingly, we affirm the judgment of the chancery court.

## FACTS AND PROCEDURAL HISTORY

¶3. On December 13, 2018, Moore filed a petition for letters of conservatorship, requesting that she be appointed as the conservator of Atkins's estate and person. The petition stated that Atkins was a widow with two children who resided at a local assisted living facility (the Arrington). Moore served the petition on one of Atkins's children, Charles Mark Atkins (Mark), who resided in California. But the petition contained no information regarding Atkins's other child, Julius. The petition included affidavits from two doctors who had examined Atkins and attested that she was not capable of managing her day-

2

to-day affairs. A hearing on the petition was set for January 16, 2019. Prior to the hearing, Mark filed a joinder in the petition and waiver of service.

¶4.     At the January 16 hearing, Moore testified briefly regarding Atkins's assets, income, and expenses. Moore also testified that Atkins had two living sons, that Mark had joined the petition, and that Atkins's other son was "not local." The possibility of selling Atkins's house was briefly discussed, and Moore stated that she understood she would need a court order to sell it. Near the end of the hearing, Moore asked, "[W]hat do we need to do about . . . protecting [Atkins] as far as Julius is concerned?" Moore's attorney then informed the chancellor that Julius was Atkins's other son. Counsel stated that Julius had "gotten a few thousand dollars from [Atkins] here and there," and counsel cautioned Moore not to give Julius any of Atkins's money without court approval. The chancellor did not inquire regarding Julius, and there was no further discussion of him.

¶5.     On January 22, 2019, the court granted Moore letters of conservatorship and appointed her as conservator of Atkins's estate and person. The court ordered Moore to post a $50,000 bond, which she did, and authorized her to pay certain of Atkins's expenses not to exceed $1,000 per month. The court also ordered that Moore should be reimbursed from the estate for attorney's fees and other costs she incurred in bringing the action and for her bond premium. In a separate order, the court also authorized Moore to make payments to the Arrington to the extent that insurance did not cover Atkins's bills.

¶6.     On February 25, 2019, Julius filed a handwritten pro se statement that he "wish[ed] to be contacted on any court hearings" in the case. Julius provided a Gautier, Mississippi

3

address. As noted above, Julius had been briefly discussed during the hearing on Moore's petition, but all that was said about him on the record was that he was "not local" and allegedly had "gotten a few thousand dollars from [Atkins] here and there."

¶7. On May 16, 2019, Moore filed a motion for authority to sell Atkins's home. Moore stated that the proceeds of the sale would be used to pay for Atkins's continued care at the Arrington. Moore attached a proposed contract to sell the property for $145,000 and an appraisal for $154,000. Moore set the motion for a hearing on May 28, 2019, and served Julius with the motion and notice of the hearing by mail.

¶8. On May 17, 2019, Moore filed a motion for authority to pay herself a conservator's fee. She requested a fee of $1,395 (93 hours at $15 per hour) and reimbursement for mileage (902 miles at $0.58 per mile). She set the motion for a hearing on June 20, 2019, and served Julius with the motion and notice of the hearing by mail.

¶9. On May 28, 2019, the court held a hearing on Moore's motion for authority to sell Atkins's home. The bailiff called for Julius, but he was not present. Moore testified briefly regarding her motion to sell Atkins's home, and the court approved her request.

¶10. On June 13, 2019, counsel for Julius filed a notice of appearance and a motion to set aside the conservatorship and compel Moore to account for her actions as conservator. Julius alleged that Moore had failed to serve him with the petition for the conservatorship as required by Mississippi Code Annotated section 93-13-253 (Rev. 2018).[1]

---

[1] At the time, section 93-13-253 provided in relevant part:

Upon the filing of [a petition for appointment of a conservator], the clerk of the court shall set a time and place for hearing and shall cause not less than

¶11. On June 20, 2019, following a hearing, the court granted Moore's request for a conservator's fee. The court noted that Julius's attorney was present at the hearing and had no "specific objections to the fee to be awarded to [Moore]." The court further noted that Julius could set a hearing for a later date on any of the other issues he had raised.

¶12. On September 11, 2019, Moore filed another motion for authority to pay herself a conservator's fee of $1,125 (75 hours at $15 per hour) and reimbursement for mileage (1,014 miles at $0.58 per mile). Julius filed a response in which he opposed Moore's request for fees and renewed his request that Moore be removed as conservator. Julius also requested a court order permitting him to visit his mother. He alleged that Moore had instructed the Arrington not to allow him to visit his mother.

¶13. On November 22, 2019, Julius filed a motion to appoint a guardian ad litem (GAL) for Atkins. Julius's motion alleged that he had "grave concerns" about unspecified "actions"

---

five (5) days' notice thereof to be given to the person for whom the conservator is to be appointed, except that the court may, for good cause shown, direct that a shorter notice be given. Unless the court finds that the person for whom the conservator is to be appointed is competent and joins in the petition, *the notice shall also be given to one (1) relative of the person for whom the conservator is to be appointed who is not the petitioner and who resides in Mississippi* if such relative is within the third degree of kinship, preferring first the spouse, unless legally separated, then an ascendant or descendant, then a brother or sister, then an adult niece, nephew, aunt or uncle, so that personal service is had on the person for whom the conservator is to be appointed *and on one (1) relative who resides in Mississippi other than the petitioner.*

Miss. Code Ann. § 93-13-253 (Rev. 2018) (emphasis added). This Code section was repealed in 2019 in the Mississippi Guardianship and Conservatorship Act. *See* 2019 Miss. Laws ch. 463, § 18 (S.B. 2828). A substantially similar notice and service requirement is now found in Mississippi Code Annotated section 93-20-403(2) (Rev. 2021).

by Moore. Julius attached copies of checks, account statements, and other documents to his motion, but he did not allege any specific wrongdoing by Moore.

¶14.    The court held a hearing on November 25, 2019. Moore testified that she did not serve Julius with the conservatorship petition because Julius had "caused his family considerable problems, and . . . because he was not good for his mother." During Moore's testimony, Julius introduced a power of attorney dated August 23, 2017, that appointed Moore and Mark as Atkins's attorneys-in-fact. Moore testified that Atkins had been diagnosed with dementia and had been admitted to the Arrington in April 2017. Julius cross-examined Moore regarding Atkins's financial accounts and expenses. Moore acknowledged that she had instructed the Arrington not to allow Julius to see Atkins. Moore testified that she did so because Julius had taken Atkins's money and had upset Atkins by calling her late at night to accuse Moore of stealing from her. Moore also testified that she had met with the police and an investigator from the Attorney General's office to report that Julius had caused Atkins to give him $3,000, which Moore considered a clear act of theft. This incident Moore testified about occurred in November 2018, and Julius was indicted in April 2019.

¶15.    Julius was about to testify when Moore's counsel suggested that the chancellor should first advise him of his constitutional rights in light of the pending indictment against him. The chancellor stated that two law enforcement officers in the courtroom had confirmed that Julius was under indictment, and the chancellor declared a recess for Julius to confer with his attorney. During the recess, Julius was taken into custody by law enforcement, and the chancellor continued the hearing as a result. The chancellor ordered that Julius should be

6

allowed to visit with Atkins in the presence of another responsible person but that Julius should not upset Atkins by discussing his dispute with Moore or any legal proceedings.

¶16.    On December 12, 2019, Julius filed another motion to appoint a GAL for Atkins. Julius again alleged that he had "grave concerns" regarding Moore's actions, but he again failed to allege any specific wrongdoing by Moore.

¶17.    On January 7, 2020, Moore filed a single-page "Inventory" of Atkins's assets, which consisted of checking and savings accounts totaling $204,719.03.

¶18.    The court held a hearing on January 16, 2020.  During her testimony, Moore acknowledged that Atkins had signed a power of attorney in 2015 that appointed her three sons—Mark, Julius, and Myron, who died in 2016—as her attorneys-in-fact.  Moore testified that in 2017, Julius asked her to take over as Atkins's attorney-in-fact because Julius said he "couldn't come home when he needed to" to attend to Atkins's affairs.  Thus, on August 23, 2017, Atkins revoked her prior power of attorney and signed a new power of attorney that appointed Mark and Moore as her attorneys-in-fact.  Moore testified that she assisted with Atkins's admission to the Arrington in 2017 because Atkins had been diagnosed with dementia.  Moore stated that she had Atkins's most recent will, which named Julius and Mark "jointly" as beneficiaries.  Moore stated that she pursued a conservatorship on the advice of an investigator from the Attorney General's office, who told her that nurses and others at the Arrington had complained that Julius was "harassing" Atkins.

¶19.    On February 10, 2020, the court ordered Moore to increase her bond to $200,000 because the sale of Atkins's home had resulted in an increase in the estate's cash assets.  The

court also ordered Moore to complete an annual accounting.[2]  The court declined to appoint a GAL and declined to remove Moore as conservator.  The court also granted Julius reasonable visitation with Atkins.  Finally, the court withheld its ruling on Moore's request for conservator's fees and mileage reimbursement until she filed the annual accounting.

¶20.  On March 27, 2020, Julius filed a motion to hold Moore in contempt because she had not increased her bond or filed an annual accounting.

¶21.  On April 1, 2020, Moore filed an annual accounting for the period of February 2019 through January 2020.  The accounting listed Atkins's bank accounts, CDs, and a money market account, and attached account statements for the period covered by the accounting. Moore also requested conservator's fees for 49 hours of her time and mileage for 550 miles. Finally, Moore asked the court to discharge her from her duties as conservator.

¶22.  Julius filed an objection to Moore's accounting and a "cross-petition for damages" and other relief.   Julius alleged that Moore's accounting was inadequate, that Moore had breached her fiduciary duties to Atkins, that Moore had made a number of withdrawals or expenditures that were not authorized by the court, and that Moore still had not increased her bond as ordered by the court.

¶23.  On May 29, 2020, Moore filed a motion to dismiss Julius's claims against her based on "unclean hands."  Moore attached a sentencing order showing that on February 27, 2020, Julius appeared in circuit court and pled guilty to the crime of exploitation of a vulnerable

---

[2] During the January 16 hearing, the chancellor stated that he would order that the annual accounting be filed "within the next 30 days."  The order entered on February 10 stated that it was to be done "during the month of January."

8

adult (Atkins). However, the circuit court withheld acceptance of Julius's plea conditioned on Julius's successful completion of a term of probation. *See* Miss. Code Ann. § 99-15-26 (Rev. 2020) (providing that a court may withhold acceptance of a guilty plea pending successful completion of conditions and dismiss the case if the conditions are met).

¶24. On June 11, 2020, Julius filed a motion to appoint an accountant to determine the accuracy of Moore's accounting.

¶25. At a status conference on June 16, 2020, Moore's attorney stated that Moore was experiencing health issues and was unable to continue as Atkins's conservator. On June 26, 2020, the court entered an order appointing the Lowndes County chancery clerk as the temporary conservator responsible for Atkins's estate and finances. The court allowed Moore to remain as guardian of Atkins's person. The court also ordered Moore "to promptly file a final accounting." The court stated that once the accounting was filed, it would consider discharging Moore and appointing a new permanent conservator. Finally, the court declined to appoint an accountant, stating that Julius should review the final accounting and then raise any issues or objections with the court. The court set the case "for a trial on the merits . . . on November 24, 2020."

¶26. On November 20, 2020—the Friday before the scheduled trial—Moore filed a final accounting covering the period of January to October 2020. Moore's accounting attached statements for Atkins's accounts and CDs for that time period. The combined value of Atkins's accounts and CDs was $259,678.04. Moore also requested reimbursement for additional time and mileage related to the conservatorship.

¶27.    On Saturday, November 21, 2020, Julius filed a motion for continuance and other relief.  Julius requested a continuance of the trial due to Moore's belated filing of the final accounting.  Julius further argued that the final accounting was inadequate because Moore only provided account statements that did not show the nature of many expenditures.  The court entered an order continuing the trial until February 4, 2021.

¶28.    On December 3, 2020, Moore filed an affidavit stating that all cash withdrawals from Atkins's accounts had been for Atkins's "personal use only" for expenses such as hair appointments, dining out with fellow residents of the Arrington, cash on hand for Atkins, and other "various sundries."

¶29.    The case proceeded to trial on February 4, 2021.  At the beginning of the trial, Julius renewed his objection to Moore's failure to serve him with process when she initially petitioned for the conservatorship in 2018.  That prompted the following exchange between the chancellor and Julius's attorney (Ms. Quarles):

> THE COURT:    Now, let me clarify.  I -- my recollection is that we knew all along or the Court knew all along about your client, but the allegation was we are not going to serve him, because we think he's going to be in a criminal situation with her money, and the Court agreed with that.
>
> MS. QUARLES:    Your Honor, I don't think that anyone knew about this criminal situation when this matter was filed.
>
> THE COURT:    Well -- and maybe it wasn't a criminal situation at the time.  It was that there were allegations that he had improperly taken money.
>
> MS. QUARLES:    There were no allegations in the pleadings.
>
> THE COURT:    The Court is -- was made aware of those.  I don't know

if it was on the record or in a discussion with Mr. Hudson [(Moore's attorney)]. We'd just have to go back and look. That's been two years ago, but the Court was made aware of why he was not served, and the Court was okay with that at the time. The record does reflect that your client was in the proceeding though almost immediately and has participated throughout so that there isn't anything that has been slipped by the goalie in this matter by his not being served. He has very actively participated in this since it started other than the initial appointment, and under the circumstances, I don't think the Court was in error in appointing Ms. Moore; although, we may have these issues that have been raised that we need to address.

¶30. Tom Prince, a CPA, then testified for Julius as an expert in the field of accounting. Prince identified a number of withdrawals, disbursements, and transfers from Atkins's accounts for which Moore had provided no explanation. Some of those transactions predated the conservatorship. Prince also prepared a schedule of Atkins's income and expenses during 2019 and 2020. Julius then rested without testifying or calling additional witnesses.

¶31. Moore again testified that Atkins at one time had a power of attorney that named Julius as her attorney-in-fact, but in 2017, Julius told her that he could not "keep taking off work to come up [to Columbus] and take care of things." Julius stated that he no longer wanted to be Atkins's attorney-in-fact, and he asked Moore to obtain a new power of attorney that named her (Moore) as Atkins's attorney-in-fact.

¶32. Moore also testified that Julius was responsible for withdrawals from Atkins's Trustmark accounts in 2018 (prior to the start of the conservatorship). Moore testified that in May 2019, she wrote a check for $2,000 from one of Atkins's accounts for Lowe's gift cards as part of the sale of Atkins's house. She explained that she agreed to give the gift

11

cards to the buyer because some of the house's appliances were inoperable. Moore also testified that she sold Atkins's car, a 2015 or 2016 Toyota Corolla, for $6,500, which she deposited in Atkins's account. She explained that Atkins no longer drove, the sales price was "about [$]400 over Bluebook," and she thought it was a fair price. Finally, Moore testified that in 2019 she had written herself three checks from Atkins's accounts for conservator's fees. On cross-examination, Moore testified that she had sold Atkins's furniture prior to the sale of the house. She stated that the furniture needed to be removed from the house for reasons related to insurance. Moore said Julius and Mark "gave [her] [$]500 for the work [she] had done" related to the sale, and the sons split the rest ($1,000 each).

¶33. At the conclusion of the trial, the chancellor directed the parties to file post-trial briefs addressing certain issues and specifying any remaining requests for relief. In a post-trial filing, Moore acknowledged that she had paid herself a conservator's fee and reimbursed herself for mileage without court approval. Although the court had withheld ruling on her request for the fee and mileage (*see supra* ¶19), Moore stated that she had "apparently misunderstood the [c]ourt's ruling and disbursed [the requested] amount to herself." Moore asked the court to ratify her payment of this amount ($1,713.12). Moore also submitted a document showing that there had been a $2,000 allowance to the buyer for new appliances in connection with the sale of Atkins's house.

¶34. Julius filed a post-trial brief and continued to argue that Moore's accountings were inadequate because they were untimely and did not include "vouchers" showing "with respect to every disbursement, to whom and for what purpose money was paid." Julius also

12

argued that Moore failed to file an inventory within three months of her appointment as conservator, as required by law. *See* Miss. Code Ann. § 93-13-33 (Rev. 2018).[3] Julius objected to Moore's unauthorized $1,713.12 payment to herself and her request for additional conservator's fees. Julius also objected to cash withdrawals that were not supported by vouchers or other evidence. As noted above, Moore had testified and submitted an affidavit stating that all cash withdrawals were for Atkins's benefit and that the funds were used to pay miscellaneous expenses for Atkins or to provide petty cash for Atkins to use. Julius also complained that Moore did not obtain court approval to sell Atkins's car or to grant an allowance for appliances. Julius also objected that Moore still had not increased her bond to $200,000, as the court had ordered. Julius also argued that Moore acted improperly by taking Atkins to a lawyer in August 2017 to sign a new power of attorney that appointed Moore and Mark as Atkins's attorneys-in-fact. Julius requested that the court (a) find Moore in contempt; (b) order Moore to provide a full accounting, beginning with her appointment as Atkins's attorney-in-fact prior to the conservatorship; and (c) add Moore's bonding company as a party and hold Moore and the bonding company "responsible for restoring the assets of [Atkins] that ha[d] been mishandled" from August 2017 forward.

¶35. In June 2021, the court entered a final judgment denying Julius's requests for relief. The court found that although it previously had declined Julius's requests to examine transactions prior to the conservatorship, the parties had tried the issue by implied consent

---

[3] Section 93-13-33 was repealed in 2019 by the Mississippi Guardianship and Conservatorship Act. 2019 Miss. Laws ch. 463, § 11 (S.B. 2828). A substantially similar requirement is now codified in Mississippi Code Annotated section 93-20-420(1) (Rev. 2021).

during the trial in February. The court also found that Julius failed to prove any wrongdoing by Moore prior to the conservatorship. Indeed, although Julius questioned certain pre-conservatorship transactions, Moore gave uncontradicted testimony that Julius made the withdrawals at issue and took the money from his mother.

¶36. Next, the court approved Moore's final accounting for the conservatorship. The court "acknowledge[d] and agree[d] with Julius that there [were] failures/shortcomings in [Moore's] [a]ccounting[s]." However, the court found that there was no evidence of any "wrongdoing on [Moore's] part." In addition, the court found the sale of Atkins's car and the allowance for inoperable appliances in Atkins's home were fair and reasonable, and there was no evidence that Moore benefitted personally from either transaction. The court did find that Moore had paid herself $1,713.12 for conservator's fees and mileage even though the court had reserved ruling on that very request. However, the court found that Moore's request was proper and ratified the payment. The court also found that although Julius had subpoenaed and obtained many of Atkins's financial records, Julius had not shown that Moore committed any material breach of duty or caused any loss to Atkins's estate. "Without such proof, the [court found] that the proper way to address Moore's failures of a procedural nature (untimely, incomplete annual accountings, etc.) [was] to remove her from her position as [c]onservator," which the court had already done. The court also denied Moore's request for additional fees and expenses, which the court found to be an adequate "sanction" for her failures as conservator. Finally, the court appointed a local attorney as the new permanent conservator for Atkins's estate.

¶37.    Julius filed a notice of appeal from the final judgment.

**ANALYSIS**

¶38.    In this appeal from a final judgment entered after a bench trial, "we will not disturb the [chancellor's] factual findings . . . unless [they] are manifestly wrong or clearly erroneous.  Whenever there is substantial evidence in the record to support the chancellor's findings of fact, those findings must be affirmed." *In re Conservatorship of Bardwell*, 849 So. 2d 1240, 1245 (¶16) (Miss. 2003) (citation omitted).  "We also recognize that because a chancellor is the only one to hear the testimony of witnesses and observe their demeanor, he or she is in the best position to evaluate a witness's credibility." *In re Allen*, 962 So. 2d 737, 741 (¶14) (Miss. Ct. App. 2007).  We review any questions of law de novo. *In re Appointment of a Conservator for Vinson*, 972 So. 2d 694, 698 (¶12) (Miss. Ct. App. 2007).

¶39.    On appeal, Julius alleges that the chancery court made multiple errors, but he raises some issues in only a cursory fashion.  Consistent with our usual practice, we will address only those issues for which Julius provides some "meaningful argument and citation of authority."[4]  Those issues are noted in the introduction to this opinion. *See supra* ¶2.

¶40.    After Julius filed his brief, Moore filed a motion requesting that the Supreme Court authorize the present conservator "to pay a reasonable sum for the defense of [the appeal]."

_____

[4] *Doss v. Claiborne Cnty. Bd. of Supervisors*, 230 So. 3d 1100, 1104 (¶10) (Miss. Ct. App. 2017) ("In the absence of meaningful argument and citation of authority, an appellate court generally will not consider an assignment of error.  A cursory argument without further reason or explanation is inadequate." (citation, quotation marks, brackets, and ellipsis omitted)); *see also Concerned Citizens of Raven Wood Subdivision v. Pearl River County*, 172 So. 3d 1234, 1236 (¶10) (Miss. Ct. App. 2014) ("It is axiomatic that the trial court's judgment is presumed to be correct and that the appellant bears the burden of showing reversible error in the court below.").

Moore stated that she "is on kidney dialysis and has numerous other health problems," that she "owns no real property and is totally disabled with a total monthly income of approximately $2,300," and that she is enrolled in "Medicaid due to her financial situation." The Supreme Court denied Moore's request. *See Atkins v. Holder*, No. 2021-CA-00780-COA (Mar. 3, 2022) (en banc order). Moore's attorney then filed a motion to withdraw. In support, he submitted a signed statement from Moore confirming that she had instructed counsel "not to perform any further work" on the case because she was "financially unable to afford it." The Supreme Court granted the attorney's motion to withdraw, and Moore did not file a brief on appeal.

¶41. When, as in this case, the appellee fails to file a brief,

> this Court has two options. First, we may take the appellee's failure to file a brief as a confession of error and reverse. This option is favored when the record is complicated or of large volume and the case has been thoroughly briefed by the appellant with apt and applicable citation of authority so that the brief makes out an apparent case of error. However, if the record can be conveniently examined and such examination reveals a sound and unmistakable basis or ground upon which the judgment may be safely affirmed, we may disregard the appellee's error and affirm.

*Thornton v. Holloway*, 49 So. 3d 125, 128-29 (¶10) (Miss. Ct. App. 2010) (citations and quotation marks omitted). For the reasons explained below, we may affirm the judgment in this case despite Moore's failure to file a brief because Julius's brief on appeal does not make out any apparent case of reversible error.

## I. Moore's Failure to Serve Julius

¶42. Julius argues that Moore failed to serve him with process as required by law. At the time Moore petitioned to establish a conservatorship, the applicable statute provided in

16

relevant part:

> Unless the court finds that the person for whom the conservator is to be appointed is competent and joins in the petition, *the notice shall also be given to one (1) relative of the person for whom the conservator is to be appointed who is not the petitioner and who resides in Mississippi* if such relative is within the third degree of kinship, preferring first the spouse, unless legally separated, then an ascendant or descendant, then a brother or sister, then an adult niece, nephew, aunt or uncle, so that personal service is had on the person for whom the conservator is to be appointed *and on one (1) relative who resides in Mississippi other than the petitioner*.

Miss. Code Ann. § 93-13-253 (Rev. 2018) (emphasis added).[5]

¶43.    We agree with Julius that the statute required Moore to serve Julius with process because he was Atkins's only living child who resided in Mississippi.  We also agree with Julius that the chancellor erred to the extent that he condoned or approved of Moore's failure to serve Julius based on Julius's alleged crime against Atkins.  *See supra* ¶29.  The statute clearly required Moore to serve Julius, and the requirement should not have been ignored based on what appear to have been off-the-record allegations of wrongdoing by Moore against Julius.  The proper course would have been to require service on Julius so that he could present any objection to Moore's appointment as conservator and formally respond to any allegations against him.

¶44.    However, the error does not require reversal or entitle Julius to any relief at this point

---

[5] As noted above, *see supra* note 1, section 93-13-253 was repealed in 2019 by the Mississippi Guardianship and Conservatorship Act, which includes a substantially similar notice and service requirement, now codified in section 93-20-403(2).  The new Guardianship and Conservatorship Act "applies to all guardianship and conservatorship proceedings commenced before January 1, 2020, unless the court, in its discretion, determines that the superseded law should apply."  Miss. Code Ann. § 93-20-125(b) (Rev. 2021).  However, Julius's brief does not mention the new Act or address whether any of its provisions apply to this case.

17

in the case. Moore no longer desires to serve as conservator, and the chancellor long ago granted her request to be discharged as conservator. Therefore, vacating the January 2019 order appointing Moore would have no prospective effect. Moreover, Julius does not identify any transactions with third parties that could or should be set aside based on Moore's failure to serve process. Finally, Julius cites no authority holding that a conservator may be ordered to pay damages for failing to comply with a statutory requirement for service of process. In summary, we conclude that the chancellor erred by condoning or approving Moore's failure to serve Julius, but given that Moore is no longer serving as conservator, the error does not warrant reversal.

## II.    Julius's Criminal Conviction

¶45.    In his appellate brief, Julius asserts that Moore falsely accused him of felony exploitation of a vulnerable adult, Miss. Code Ann. § 43-47-19(2)(b) (Rev. 2021). According to Julius, he merely accompanied "his mother . . . to a bank and withdrew $3,000.00 from a joint account owned by [him] and his mother." Julius further asserts that he pled guilty to this felony only because he was given an opportunity for non-adjudication. He says "[i]t is a matter of public record that [he] is a 59 year old man who has a serious heart condition and, in the opinion of his attorneys, could not have survived at Parchman or any other penal facility."

¶46.    However, there is nothing in the record to support Julius's argument. Moore testified that Julius took Atkins to the bank while she was suffering from dementia and effectively stole $3,000 from Atkins's account. Moore's testimony on this point stands uncontradicted.

18

In addition, Julius's sentencing order shows that he pled guilty to felony exploitation of a vulnerable adult, though the court withheld acceptance of the plea and placed him on probation. Finally, account statements in the record show that Julius was not an owner of the bank account from which the funds at issue were taken. In short, the actual evidence in the record indicates that Julius did in fact take $3,000 from his mother's bank account and exploit a vulnerable adult who was suffering from dementia. As the chancellor put it, Julius made a choice not to attend the trial or testify, and that choice "contributed to the lack of proof presented on his behalf." The unsupported assertions in Julius's "appellate brief[] are not evidence and will not be used as grounds for reversing the trial court's judgment." *Abercrombie v. Abercrombie*, 193 So. 3d 680, 683 (¶9) (Miss. Ct. App. 2016).

### III. Moore's Accountings

¶47. A conservator is required to file an annual accounting that must show, inter alia, "each item of expenditure" for the ward's maintenance and for "the presentation and management of [the ward's] estate, *supported by legal vouchers*." Miss. Code Ann. § 93-13-67 (Rev. 2018) (emphasis added).[6] "Every such voucher shall consist of a receipt or canceled bank check showing to whom *and for what purpose* the money was paid." UCCR 6.04 (emphasis added). Thus, for each expenditure, the conservator must submit a "voucher" that includes sufficient information not only to identify the payee but also to establish the "purpose" of the payment. Jane Stroble Miller, *Vouchers You Can Vouch For*, The Better Chancery Practice

---

[6] Section 93-13-67 was also repealed in 2019 by the Mississippi Guardianship and Conservatorship Act. 2019 Miss. Laws ch. 463, § 11 (S.B. 2828). The current requirements for an annual accounting are found in Mississippi Code Annotated section 93-20-423 (Rev. 2021).

Blog (Sept. 23, 2010), https://betterchancery.com/2010/09/23/vouchers-you-can-vouch-for/. If documentation of an expenditure "does not do that job, it is not an acceptable legal voucher." *Id.*[7]

¶48.    In the present case, Moore failed to comply with section 93-13-67 or Uniform Chancery Court Rule 6.04.  Moore submitted bank statements that included images of canceled checks.  But she submitted no receipts to support the payments, and a number of the canceled checks provided insufficient information regarding the purpose of the expense. The chancellor acknowledged the shortcomings and inadequacies of Moore's accountings. Nonetheless, the chancellor found no evidence of any wrongdoing by Moore and no evidence that Moore caused any meaningful loss to Atkins's estate.

¶49.    On appeal, Julius argues that the chancellor erred and that the chancellor should have ordered Moore to provide a true accounting and reimburse the estate for improper or unauthorized expenditures.  In support of this argument, Julius block quotes multiple pages of Prince's testimony.  In particular, Julius quotes testimony regarding a schedule Prince prepared summarizing expenditures that he considered "improper" for someone in Atkins's "position in life and . . . health."  Prince said that the "items [he] listed totaled $39,568."  In his brief on appeal, Julius then asserts, without further elaboration, "Thereby making the aggregate amount in damages a total of $39,568."

¶50.    However, the withdrawals and checks underlying Prince's figure are explained by evidence that supports the chancellor's findings and final judgment.  One item on Prince's

---

          [7] Miller's post on Judge Larry Primeaux's *The Better Chancery Practice Blog* provides a very helpful discussion on the need for "vouchers" to support an accounting.

list was the $3,000 withdrawal in November 2018—prior to the conservatorship—that was the subject of Julius's indictment. Moore testified that Julius caused his mother to make the withdrawal and that she (Moore) had nothing to do with it. Moore's testimony on that point stands uncontradicted. Prince's list also includes two July 2018 withdrawals from Trustmark that predate the conservatorship and correspond to an equal deposit made to another of Atkins's accounts the following day. The evidence indicates that these funds were merely transferred to a different account that was also owned by Atkins. Prince also listed a $2,000 check payable to Lowe's. But Moore explained that the check was for an allowance for inoperable appliances in connection with the sale of Atkins's house. Although Moore did not obtain prior court approval for this expenditure, the chancellor credited her uncontradicted testimony regarding its purpose, and he found that there was no evidence that she had "converted or misapplied any of the $2,000." Finally, Prince also listed checks payable to Moore that were for conservator's fees or mileage. The chancellor approved of these payments either before they were made or after the fact.

¶51. Julius is correct that Moore failed to obtain court approval prior to making some of these payments. "Applicable case law, however, has consistently held that the chancellor may later ratify any such expenditures that were made without prior approval." *In re Appointment of a Conservator for Vinson*, 972 So. 2d at 702 (¶28) (citing *U.S. Fid. & Guar. Co. v. Conservatorship of Melson*, 809 So. 2d 647 (Miss. 2002); *Neville v. Kelso's Guardianship*, 247 So. 2d 828 (Miss. 1971)). Here, we cannot say that the chancellor abused his discretion by finding no wrongdoing by Moore or by approving certain expenditures after

21

the fact.

¶52.   In addition, although the chancellor acknowledged that Moore failed to submit adequate vouchers in support of her accountings, we cannot say that the chancellor erred or abused his discretion by approving her final accounting and discharging her as conservator. Substantial evidence supports the chancellor's findings that Moore did not convert or misspend any of Atkins's funds and committed no wrongdoing while serving as Atkins's conservator. Substantial evidence also supports the chancellor's finding that, in retrospect, Moore was simply unable to meet some of the requirements of serving as a conservator. The record indicates that even if she were ordered to do so, Moore would be unable to produce additional receipts or other information at this late date. Under these circumstances, we cannot say that the chancellor erred or abused his discretion by declining to compel Moore to produce a more complete accounting.

### IV.   Moore's Failure to Increase Her Bond

¶53.   Julius briefly complains that Moore failed to increase her bond to $200,000, as the chancellor ordered. The chancellor initially ordered Moore to post a $50,000 bond, which Moore did. The chancellor later ordered Moore "to increase the bond to $200,000 and authorize[d] payment of the bond premium from [Atkins's] funds." The chancellor ordered Moore to increase the bond because of the increase in value of Atkins's cash assets following the sale of her home.

¶54.   However, Moore has been discharged as conservator, and there is no evidence that she took any action while serving as conservator that would give rise to a claim against her

22

bond—let alone a claim exceeding the original $50,000 bond. Julius fails to explain what relief would be appropriate under these circumstances. We conclude that the issue is moot and that further proceedings regarding the bond would be of no benefit to Atkins. *See London & Stetelman Inc. v. Tackett*, 308 So. 3d 445, 453 (¶¶21-22) (Miss. Ct. App. 2020) (holding that the chancellor's alleged error in failing to require a bond was moot after final judgment had been entered and that there would have been no claim against the bond).

## CONCLUSION

¶55. We do not condone Moore's failure to serve process on Julius, her failure to maintain adequate records and produce a full and complete accounting, or her failure to increase her bond in response to a court order. Nonetheless, substantial evidence supports the chancellor's findings that Moore did not convert or misspend any of Atkins's funds or commit any other wrongdoing while serving as conservator. Moreover, once Moore had been removed as conservator, the chancellor did not err or abuse his discretion in determining that Julius was not entitled to any further relief. Therefore, we affirm the judgment of the chancery court.

¶56. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; McCARTY, J., JOINS IN PART.**

**WESTBROOKS, J., SPECIALLY CONCURRING:**

¶57. I write separately to stress the importance of the chancellor's oversight role in a conservatorship. This role is not perfunctory, nor is it merely administrative. The chancellor

23

is an essential part of the system that our Mississippi Legislature has built to protect our most vulnerable citizens from abuse. When a chancellor performs his or her supervisory role properly, the chancellor's actions protect the court, the conservator, and most importantly the ward.

¶58. The majority is correct in concluding that the chancellor did not abuse his discretion when he approved the final accounting, so I concur. However, the chancellor's failure to proactively monitor the expenses claimed throughout the duration of the conservatorship helped create the undesirable situation at issue in this case.

¶59. A conservatorship is created when a citizen of the State has been deemed unable to manage his or her own property or financial affairs because of a lack of ability to act independently. Miss. Code Ann. § 93-20-401 (Rev. 2018). Transferring the legal authority and responsibility for managing another's property by creating a conservatorship is an extraordinary measure and should be treated with the utmost attention and care. It is hard to imagine a more vulnerable situation in which people might find themselves. The ward's own autonomy has been lost. Recognizing the inherent vulnerability in such a situation, the Legislature and the courts have established guidelines to protect the ward from abuse. The inventory, reporting, and accounting requirements established in Mississippi Code Annotated Sections 93-20-401 through-431 and enforced by the Uniform Chancery Court Rules (e.g., Rule 6.01) were instituted to prevent exploitation of the ward by the conservator. It is the chancellor's duty to diligently and vigorously apply these rules. This duty includes ensuring that more than just a bare-bones accounting of expenditures be performed. The chancellor

must certify that the conservator is using the resources of the ward appropriately.

¶60.    In the present case, there was no timely inventory made of the ward's property. Cash withdrawals without vouchers were allowed.  Cancelled checks without receipts were accepted as vouchers without showing the purpose of the purchase, as required by Uniform Chancery Court Rule 6.04.  It is true that a chancellor has the authority to ratify previously unauthorized expenses (*see, e.g.*, *In re Appointment of a Conservator for Vinson*, 972 So. 2d 694, 702 (¶¶28-29) (Miss. Ct. App. 2007)), but this does not mean that a chancellor should fail to take every opportunity to vigilantly monitor the actions of the conservator proactively. Failing to do so would not live up to the trust placed in the chancellor to safeguard the ward.

¶61.    Furthermore, failure to diligently enforce these guidelines exposes every person involved in the conservatorship to possible repercussions.  As the ultimate steward of the ward, the reputation of the court itself is threatened by ineffective or unequal applications of the conservatorship rules.  The attorneys representing the conservator are subject to sanctions or disbarment in cases of exploitation or neglect. *See Foote v. Miss. State Bar Ass'n*, 517 So. 2d 561, 564 (Miss. 1987) (citing *Clark v. Miss. State Bar Ass'n*, 471 So. 2d 352 (Miss. 1985)).  These reasons are second to the protection of the ward, of course, but they still reinforce the magnitude of the importance for the chancellor to zealously follow these guidelines.

¶62.    In one case, the Mississippi Supreme Court expressed "profound concern" that the attorneys and chancellors involved were failing to appreciate their "special and far-reaching fiduciary duties" that go along with a conservatorship. *In re Conservatorship of Mathews*,

633 So. 2d 1038, 1040 (Miss. 1994). The Court continued:

> As for chancellors, a chancellor who must approve accounts and inventories has a *duty beyond* deciding lawsuits. He is under an obligation first to see that accounts and inventories filed comply with the statutes before he approves them. He is also the 'superior guardian' of the ward.

*Id.* (emphasis added).

¶63. Overseeing a conservatorship creates a superior duty. In depriving an individual of autonomy and appointing a conservator, the State is morally and legally bound to ensure the proper safeguards are in place to protect the ward. I write separately to ensure the chancellor, as "superior guardian of the ward," keeps this special duty at the front of his or her mind.

**McDONALD, J., JOINS THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**